# United States Court of Appeals
## For the First Circuit

No. 03-1676
No. 03-2294
No. 03-2348

ANITA M. FLYNN,

Plaintiff, Appellant,

v.

AK PETERS, LTD.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]
[Hon. Morris E. Lasker, Senior U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge, and
Lipez, Circuit Judge.

Thomas W. Humphrey, with whom Seth S. Soffregen, William J. Flynn, Neyhart, Anderson, Freitas, Flynn & Grosboll, and Wood Herron & Evans were on the brief, for appellant.
Peter G. Hermes, with whom Gina A. Fonte and Hermes, Netburn, O'Connor & Spearing, PC were on the brief, for appellee.

July 26, 2004

**LIPEZ**, <u>Circuit Judge</u>. Plaintiff, an engineer and writer, brought suit against her publisher for accepting book revisions from her co-author without her consent and for giving a third individual co-authorship credit when she felt that his effort did not merit such credit. After losing her Lanham Act claim at summary judgment, and suffering judgment as a matter of law and an adverse jury verdict on her remaining claims at trial (as well as a judgment against her for attorney's fees post-trial), Flynn raises a bevy of claims on appeal. We affirm.

**I.**

We set forth the background, reserving some of the details until the discussion of the individual issues on appeal. Plaintiff-appellant Anita M. Flynn is an electrical engineer and robotics scientist who wrote a book with a colleague, Joseph Jones, entitled <u>Mobile Robots: From Inspiration to Implementation</u>. The book was published in 1993 by Jones & Bartlett Publishers, Inc. Shortly after publication, Jones & Bartlett assigned its publication rights to AK Peters, a publishing house named after its principals, Alice and Klaus Peters. The book was a great success, and Klaus Peters asked Flynn and Jones to write a second edition of the book in 1997. Hoping to have the revised edition published by the next spring, Peters suggested that they invite another contributor to help them with the research and writing. Jones and Peters later agreed that Bruce Seiger, a high school teacher, would

be added as a co-author and would write a chapter addressing educational applications and curriculum proposals.

To confirm this agreement, Peters wrote to Flynn on August 23, 1997, asking if she was amenable to the proposed revision with Seiger's assistance. Flynn responded in a letter dated November 16, 1997:

> I received your letter as to the second edition of our book and would be happy to agree to your suggested arrangement--on one condition. That is, you send me my money for my portion of the royalties on sales from January '97 through June '97 in the next month.

Alice Peters responded via letter on December 4, 1997:

> Thank you very much for your letter of November 16. I am enclosing an accounting of the sales of your book, Mobile Robots, for the period January-June 1997 along with a check for settlement of the royalty for those sales. We are pleased that you have agreed to our suggestion regarding the 2d edition of Mobile Robots. We will be forwarding a contract to you soon for the signature.[1]

The publisher did not directly send Flynn a revised contract. However, it had previously sent Jones four copies of the author contract (one each for Jones, Flynn, Seiger, and AK Peters) and two copies of a contract for the curriculum guide (one each for Jones and Seiger) on October 3, 1997. Jones and Seiger began revising

_____

[1] Prior to trial in the district court, AK Peters claimed that this agreement constituted a separate, superseding contract between AK Peters and Flynn; however, the publisher chose not to argue that point at trial.

the text even though neither of the two original authors had signed the contract.

Flynn did not have any further discussions with AK Peters or its principals while Jones and Seiger revised the text. In fact, she was largely uninvolved in the revision process. Perhaps recognizing her diminished role, she agreed in May 1998 to give half of the royalties from the revised edition to Jones and to split the other half with Seiger.[2]

Although Jones and Seiger worked together to revise the text, their relationship was not always harmonious. Jones wrote Seiger an e-mail in early August 1998, in which he said that he was planning to drop Seiger as a co-author because "none of the contributions [Seiger was] uniquely qualified to make appear[ed] in the new edition." After they discussed Seiger's involvement in the project, Jones decided not to remove Seiger's name from the book after Seiger agreed to take on more work. At some point, Jones and Seiger decided, with AK Peters' consent, to publish the curriculum guide as a separate book rather than including it as a section of Mobile Robots.

AK Peters sent the book to the printer without Flynn's knowledge in early September 1998. A few weeks later, she asked

---

[2]AK Peters has not paid Flynn any of the royalties from the sale of the revised edition of Mobile Robots. It claims that it is waiting for the authors to settle on the final allocation scheme. Flynn claims that it is simply withholding the royalties in retaliation for her lawsuit.

Jones if she could see a copy of the revised manuscript. In mid-October, well over one month after AK Peters sent the manuscript to the printer, Flynn told Jones that "[she] looked through the manuscript and didn't see anything that [Seiger] wrote." Jones responded that Seiger "revised [one of the] chapter[s], added the contests section, and contacted virtually every supplier in the yellow pages, data books and trade magazines sections to verify the addresses. He also did a word-by-word review of the whole book looking for typos and inconsistencies." Jones noted the difficulties that he and Seiger had in August, but said that "[Seiger] actually did a tremendous amount of work at the end, without his help it would not have been possible to get the book out by [the deadline]." Responding to Flynn's concern that Seiger did not write the curriculum chapter, Jones informed her that he and Seiger were going to write that chapter as a separate book.

Flynn insisted that Seiger's contribution was "more in line with an acknowledgment" and refused to sign the revised authors' contract, even after Jones offered to restructure the royalty distribution. Jones informed Flynn in late October that if she did not sign the contract, AK Peters would exercise its rights under Paragraph L of the original contract, which read:

> The Author/Editor agrees to revise the Work when the Publisher shall decide that a revision is desirable, and to deliver same within a reasonable time after such request. Should the Author/Editor be unable or unwilling to undertake such revision, or be

> deceased, the Publisher may arrange in agreement with the Author/Editor not to be unreasonably withheld, for the preparation of a revised manuscript, the cost of which (including such royalties or fees as the Publisher may elect to pay) shall be paid by the Publisher and charged against any first royalties that may accrue to the Author/Editor from the sale of the revised edition. All terms of this Agreement shall apply to each revision as though it were the work being published for the first time.

Jones claimed that this provision "basically says that they can publish revised editions of the book and, if [Jones and Flynn] don't help, they will employ whatever help they need and allocate payments accordingly."

Flynn sent a letter to AK Peters via certified mail three days later, informing the publisher that she had not agreed to the revised contract. She said that she had reviewed the revised manuscript and found a number of errors but said that her biggest concern was the decision to list Seiger as a co-author. She said that she only agreed to AK Peters' proposed revision because she thought that Seiger was going to write a curriculum chapter and that she refused to share credit and royalties for the revised edition of the book without this contribution. She also expressed concern that Seiger rewrote one of the chapters that was designed to provide an easy introduction to robotics and added an electronic circuit design that would not work. Flynn acknowledged Jones' comment regarding AK Peters' right to revise the text under Paragraph L but asserted that this right was not triggered under

the circumstances present at that time. She argued that Paragraph L only gave the publisher discretion to revise when an author was unable or unwilling to participate in a revision. Since Flynn had attempted to participate in the revision, AK Peters could not invoke its Paragraph L rights. Similarly, she claimed that since her objection to listing Seiger as a co-author was reasonable, the publisher could not add him as an author until she was satisfied with his contribution. She said that "[i]f Mr. Seiger performed his part of the deal, there would be very few problems. He did not." Toward the end of the letter, Flynn stated that she would seek appropriate legal relief if AK Peters insisted on continuing with publication of the revised edition as it appeared at that time.

AK Peters responded to that letter by noting the contributions that Seiger made to the book and by informing Flynn that it had already sent the book to the printer by the time that she notified them of her objections. It offered to address the errors that she identified by printing an errata sheet and to address the authorship issue by listing her before Seiger.

That arrangement was not acceptable to Flynn. She filed a lawsuit against AK Peters and its principals in the United States District Court for the District of Northern California on December 2, 1998 alleging: 1) violation of the Lanham Act, 15 U.S.C. § 1125(a); 2) violation of California Business and Professions Code

§ 17200 (concerning "unlawful, unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising"); 3) violation of the California Civil Code § 3344 (concerning trade misappropriation); and 4) breach of contract.[3] After the suit was transferred to the District of Massachusetts, AK Peters filed a motion for summary judgment on all claims on March 14, 2000. The court granted the motion with regard to the Lanham Act claim, and the parties went to trial on the remaining three claims.

At trial, AK Peters filed a motion for judgment as a matter of law (JMOL) on all three claims after both sides had the opportunity to present their cases, arguing that it was entitled to judgment on the breach of contract claim because Flynn failed to show that AK Peters materially breached the contract and that even if it did breach the original contract between the authors and the publisher, Flynn failed to show that she suffered any damages as a result of that breach. Flynn responded, inter alia, that AK Peters did indeed breach Paragraph L of the original contract and that she had presented sufficient evidence of damages during her trial testimony. After stating that it would reserve its decision on the JMOL motion, the court asked the parties to submit jury instructions that it could use to formulate the jury charge.

_____

[3]Flynn filed a separate suit against Jones and Seiger on June 26, 2000 that was consolidated with the suit against Peters and settled on January 29, 2003.

-8-

Flynn's proposed instruction stated that the "essential elements of a breach" included "[d]amage to the Plaintiff arising from the failure to perform."

The next morning, prior to charging the jury, the court announced that it was dismissing the contract claim "on the grounds that there's an absolute dearth of evidence with regard to damage flowing from the breach of contract."[4] It denied the motion with regard to the two California state law claims and informed the parties that "[they] may wish to adjust [their] closing statement accordingly." The parties made their closing arguments, the court instructed the jury, and the jury returned a verdict in favor of AK Peters on the two California state law claims. Flynn did not file any post-verdict motions. However, AK Peters filed a motion for $55,000 in attorney's fees under section 3344's fee-shifting provision. The court granted that motion. Flynn subsequently appealed the final judgment on the merits and the award of attorney's fees.

Flynn essentially raises four issues in her appeal. First, she argues that the publisher's use of her name on the book without her consent constituted a violation of the Lanham Act and that the district court applied the wrong standard when it granted

---

[4]Flynn argued that the court should still enjoin AK Peters from selling Mobile Robots to remedy the purported breach, but the court rejected that request. Flynn does not renew that request on appeal.

AK Peters summary judgment on her Lanham Act claim. Second, she claims that the district court erroneously granted JMOL to the publisher on her breach of contract claim based on its mistaken conclusion that she had not demonstrated damages arising from the alleged breach. Relatedly, she claims that the timing of the court's erroneous JMOL ruling, which the court issued right before the parties presented their closing arguments to the jury, created the misperception in the jurors' minds that she consented to publication and that this perception prejudiced the jury's consideration of her two California state law claims. Third, she claims that the court improperly instructed the jury regarding the meaning of Paragraph L and its relevance to her California state law claims. Finally, she claims that AK Peters waived its right to attorney's fees under the California fee-shifting provision; even if it did not waive its right to fees, she asserts that the district court's fee award was overly generous. We consider these claims seriatim.

## II.

### A. Lanham Act

Flynn claims that AK Peters violated the Lanham Act by listing her as an author of the second edition of <u>Mobile Robots</u> without her consent. More specifically, she alleged in the district court that "[t]he misleading use of her name is likely to cause confusion by consumers as well as plaintiff's academic peers

in that it will be assumed that she contributed to the revisions and approved of the changes." Concluding that Flynn failed to demonstrate that her name "is so associated with robotics that within the robotic community it has an independent value or meaning," the district court granted summary judgment to AK Peters on her Lanham Act claim. Flynn claims that this "independent value test" has no basis in First Circuit precedent and that she properly opposed AK Peters' summary judgment motion by citing her experience in the robotics field and by alleging that she is famous within the robotics community.[5]

Section 43(a) of the Lanham Act creates civil liability for, <u>inter alia</u>:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false designation of origin [which] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). This provision "is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of confusingly similar

---

[5]No party has argued to us the effect of <u>Dastar</u> v. <u>Twentieth Century Fox Film Corp.</u>, 123 S. Ct. 2041 (2003) on this claim. As a result we do not reach any issue under <u>Dastar</u> as to whether a claim is stated here. Rather, we deal with the case on the terms briefed to us by the parties.

marking and packaging, which would create an impression that the products of the defendant originated with the plaintiff." Purolator, Inc. v. EFRA Distributors, Inc., 687 F.2d 554, 561 (1st Cir. 1982). See also Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir. 1994) (stating that section 43(a) prohibits, inter alia , "'palming off[,]' . . . in which 'A' sells its product under 'B's' name"). The key inquiry in a section 43(a) case is whether the defendant's use of the plaintiff's trademark creates confusion in the minds of consumers.

The Lanham Act defines the term "trademark" to include any word or name used by a person "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Strong and distinctive trademarks, such as fanciful words (e.g., "Clorox") and words used in arbitrary ways (e.g., "Apple Computers"), receive greater protection than weak, generic marks (e.g., "bleach"). Some words are so common within a particular context that they cannot secure any trademark protection until they acquire a special association with a particular source of consumer products or services. This association is called "secondary meaning." Pursuant to this doctrine, "'[w]ords which have a primary meaning of their own . . . may by long use in connection with a particular product, come to be known by the public as specifically designating that product.'" Volkswagenwerk

-12-

AG v. Wheeler, 814 F.2d 812, 816 (1st Cir. 1987) (quoting Volkswagenwerk AG v. Rickard, 492 F.2d 474, 477 (5th Cir. 1974)); see also DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 606 (1st Cir. 1992) (stating that secondary meaning "refers to a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source").  "The establishment of secondary meaning in a word is an issue of fact," Wheeler, 814 F.2d at 816, and the individual seeking protection for a mark bears the burden of proving that secondary meaning has attached within the relevant class of consumers.  Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993).  "There is sufficient secondary meaning as long as a significant quantity of the consuming public understand a name as referring exclusively to the appropriate party . . . ."  President & Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804, 807 (1st Cir. 1975); see also 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:8 (4th ed. 2004) (stating that to establish secondary meaning, a plaintiff needs to show "that the ordinary buyer associates the mark with a single, albeit anonymous, source").[6]

---

[6]As we understand the district court opinion, it used the word "independent value or meaning" as a synonym for "secondary meaning."  Contrary to Flynn's claim, the district court did not develop an "independent value" test that reached beyond the established precedents on secondary meaning.

Personal names are included in the class of common words that may not secure protected trademark status until secondary meaning has attached. See Donoghue v. IBC/USA (Publications), Inc., 886 F. Supp. 947, 952 (D. Mass. 1995) ("[S]urnames, when used as trademarks, are inherently indistinctive, i.e., weak [and] are permitted trademark protection only upon a showing that they have become strong marks by acquiring distinctiveness through secondary meaning."); 2 McCarthy, supra, § 13:2.  According to Professor McCarthy:

> Secondary meaning grows out of long association of the [personal] name with the business, and thereby becomes the name of the business as such; is acquired when the name and the business become synonymous in the public mind; and submerges the primary meaning of the name as a word identifying a person, in favor of its meaning as a word identifying that business.

Id.  Therefore, before we can consider whether AK Peters infringed upon Flynn's purported use of her name as a trademark, we must evaluate whether Flynn's name has acquired secondary meaning within the relevant class of consumers.

"Proof of secondary meaning entails vigorous evidentiary requirements." Boston Beer Co., 9 F.2d at 181.  The plaintiff must not only show that it used a personal name as a trademark, but that a "substantial portion of the consuming public associates [the name] specifically with [its] business." Id. at 182.  Furthermore, the plaintiff must show that these consumers base purchasing

decisions upon seeing the trademark (i.e. the personal name) on the product:

> To acquire a secondary meaning in the minds of the buying public, a labelled product, when shown to a prospective customer, must prompt the reaction, "That is the product I want because I know that all products with that label come from a single source and have the same level of quality." In other words, the article must proclaim its identity of source and quality, and not serve simply to stimulate further enquiry about it.

2 McCarthy, supra, § 15:11. The plaintiff can meet this evidentiary burden through the use of direct evidence, such as consumer surveys or testimony from consumers, or through the use of circumstantial evidence. Since Flynn did not provide any direct evidence on this issue, we will focus on the requirements for circumstantial evidence. A plaintiff may establish secondary meaning for a name by presenting circumstantial evidence regarding: "(1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture." Boston Beer Co., 9 F.3d at 182; see also 815 Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 648 (2d Cir. 1988) (including among the factors that may be considered to prove secondary meaning "advertising expenditures, consumer surveys, media coverage, attempts to copy the mark, and length and exclusivity of use").

-15-

Flynn submitted for the summary judgment record a copy of her curriculum vitae and an affidavit in which she stated that she has worked in the robotics field since 1985, has given seventy invited talks and written twenty-nine papers in the field, and has founded a company that designs micro robots. Viewed in the proper light, she claims that this evidence demonstrates that "she has an esteemed reputation and a well-recognized name." This claim ignores the stringent requirements for secondary meaning evidence. "Such 'opinion' testimony by a [party] is considered self-serving and of little probative value." Fay's Drug Co., 842 F.2d at 648. It would be more important to know, for example, how likely it would be for the average consumer of books like Mobile Robots to be aware of the papers Flynn cites. It is the mindset of these likely consumers and not simply the strength of her publication record in the abstract that matters in determining whether secondary meaning has attached. Moreover, Flynn declared that the authors intended to market the book to "a wide audience" from "high school age to Ph.D. level researchers"; therefore, it is this broad class of consumers and not a select subset of academic "insiders" that matters for secondary meaning purposes. Flynn failed to produce any evidence demonstrating that this extended group of consumers is aware of her academic achievements.

Flynn also says in her affidavit that a handful of strangers have told her that they recognized her from a talk or

that they had read her book, and her nephew says in his affidavit that a robotics graduate student that he met said that Flynn was "famous." However, such limited anecdotal evidence does little to establish that her name has acquired secondary meaning within the class of consumers who would be likely to purchase a book on robotics, and that these consumers would be more likely to purchase books because her name was on the cover.

Flynn's reliance on Donoghue highlights the weakness of her case. In that case, the court enjoined a mailing company from using the plaintiff's name and face in an advertisement after the plaintiff, a financial expert, introduced evidence demonstrating that

> [He] is a nationally known investment advisor, with expertise in the subject of money market and mutual fund investing. He has been in the business of providing investment advisory services to the general investing public for approximately twenty-two years. The plaintiff has written ten books on the subject of investment advice and is a nationally syndicated financial columnist. Over the past decade, he has appeared frequently on network, cable and syndicated television shows dealing with financial markets, financial advice, and investments, and, over the past twenty-two years, he has participated in hundreds of seminars and conferences regarding investment strategies.

Id. at 948-49. He also produced a monthly audio cassette investment advisory service and an electronic mutual fund tracking and analysis service and published a print newsletter, which had

-17-

17,000 subscribers and was "well-known among consumers and in the financial advisory services industry for its analyses of market trends and its mutual fund recommendations." Id. at 949. Given this circumstantial evidence, the court concluded that the plaintiff "has become widely known, due to his efforts during the past twenty-two years, as [a financial] expert" and that his name "through numerous publications and determined self-promotion, has become associated in the public mind with expertise in strategic investment advice." Id. at 953. Accordingly, the court did not have difficulty concluding that "the plaintiff's surname has acquired a secondary meaning vesting it with protected trademark status." Id.

Flynn's summary judgment offerings do not remotely approach the evidence of secondary meaning presented in Donoghue. If Flynn's evidence demonstrated anything, it is that she has expertise in the robotics field and that a handful of individuals in the field have recognized her name and face. That evidence did not demonstrate that the relevant consumers have associated her name with a product. She did not demonstrate that a reasonable factfinder could conclude that her name serves anything more than its primary function to identify her as an individual. Given this failure to demonstrate that her name has acquired secondary meaning, we must agree with the district court that the Lanham Act does not apply to her claim.

-18-

**B.  Breach of Contract**

Flynn alleged that AK Peters breached its original publication contract with her by accepting revisions to <u>Mobile Robots</u> and adding Seiger as a co-author without her consent.  She claims on appeal that the district court erroneously granted AK Peters' JMOL motion on her breach claim based on its mistaken conclusion that she failed to establish damages from the breach. She cites evidence relating to damage to her reputation and damage due to AK Peters' decision to withhold her royalties.  Moreover, she argues that even if she did not prove actual damages, "her claim for breach of contract should still have been submitted to the jury with an instruction on <u>nominal</u> damages."[7]

1.  Actual Damages

Flynn's claim that AK Peters owes her royalties for the second edition of <u>Mobile Robots</u> cannot support her claim for a breach of Paragraph L of the original publication contract (dealing with the relationship between the authors/editors and the publisher over revisions to the first edition of <u>Mobile Robots</u>).  Even if AK Peters has withheld her royalties to retaliate for this lawsuit,

---

[7]Flynn also cites "lost wages" in her brief.  However, she does not actually claim that she has lost wages.  Rather, she simply argues that she will have to spend two years of her life writing a new book to eliminate the current stain on her reputation.  Therefore, we consider the wages claim to be an attempt to monetize her reputational harm and not an independent source of harm.

that alleged breach would constitute a separate breach never relied upon in Flynn's pleadings and never actually litigated at trial.

Flynn's allegation of harm to her reputation also fails. As the Massachusetts courts have stated, "[d]amages for injury to reputation are usually not available in contract actions," Daley v. Town of West Brookfield, 476 N.E.2d 980, 980 n.1 (Mass. App. 1985), because such damages are remote, speculative, and not within the contemplation of the parties. See Redgrave v. Boston Symphony Orchestra, Inc, 855 F.2d 888, 892 (1st Cir. 1988) (en banc). We have made exceptions to this general rule when plaintiffs have provided evidence of specific harm that is proximately related to their reputational injury. See id. (allowing recovery for harm to reputation when the plaintiff, an actress, identified specific movie and theater performances that would have been offered to her but for the breach of contract); see also Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990) ("Massachusetts might . . . decide to respond to these foreseeability concerns not by rejecting reputation-damage claims entirely, but by allowing them if plaintiffs can show specific identifiable lost job opportunities or an equivalently particular form of injury.").

Flynn failed to make such a particularized showing. In fact, her trial testimony undercut her claim that the alleged breach of AK Peters harmed her professional reputation. When she was asked whether any person told her that they thought less of her

-20-

because her name was on the revised edition of <u>Mobile Robots</u>, she replied: "People treat me okay.  Nobody has told me that they think less of me.  But people have told me they think more of me for standing up for this and pursuing this litigation."  Moreover, she was named a visiting assistant professor at the University of California at Berkeley <u>after</u> the second edition of <u>Mobile Robots</u> was published, and she admitted in her deposition that she was not aware of having "been denied any grants or any job promotions because of the second edition of the book."  Viewing Flynn's allegations regarding reputational harm within the context of Massachusetts case law, we have no difficulty concluding that she failed to introduce any evidence substantiating damages from AK Peters' publication of the revised edition of <u>Mobile Robots</u>.

<u>2.  Nominal Damages</u>

Flynn is correct that she would have been entitled to nominal damages even if she could not prove actual damages as part of her contract claim.  Under Massachusetts law, a person who is injured by a breach of contract has a right to judgment even if the breach caused no harm. <u>Nathan</u> v. <u>Tremont Storage Warehouse</u>, 102 N.E.2d 421, 423 (Mass. 1951); <u>see also</u> <u>Restatement (Second) of Contracts</u> § 346 (1979).  If Flynn had raised the issue properly, the court should have allowed her breach of contract claim to go to the jury with an instruction on nominal damages.

We conclude, however, that Flynn forfeited her right to appeal the court's erroneous conclusion that she was required to prove actual damages to establish a breach of contract claim. When AK Peters argued in favor of its motion for JMOL by stating that she failed to prove damages, Flynn did not make the nominal damages argument. Instead, she argued that she had, in fact, proved damages. Also, she herself asserted that proof of damages was an essential element of a breach of contract action.[8] Hence, she has unmistakably forfeited her claim that the district court erroneously granted JMOL on her contract theory, as well as her related claim of prejudice related to the timing of the court's ruling.[9]

## C.  Jury Instruction on California Statutory Claims

After the jury had been deliberating for six hours on Flynn's two remaining claims, the California statutory claims, one of the jurors sent a note to the court asking it to "explain Paragraph L of the original contract in layman's terms." That

---

[8]Flynn does not argue to the contrary on appeal. Instead, she cites the portion of AK Peters' proposed jury instruction in which it stated that she was entitled to nominal damages if she established the other elements of her contract claim. Flynn cannot rely on the proposed instruction of the defendant to meet her own obligation to raise the nominal damages issue with the district court.

[9]Theoretically, Flynn could request plain error review of her forfeited claim, see Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc); however, she makes no such argument on appeal, and any such argument would be unavailing.

portion of the contract provides that 1) the authors are obligated to provide a revised edition if the publisher requests one; 2) if the authors are unable or unwilling to revise the text, the publisher may hire another person (paid with a portion of the authors' royalties) to perform the revision; and 3) the authors may not "unreasonably withhold" their consent regarding the process once the publishers undertake a revision. The contract also states that all of the terms of the original contract apply to future revisions as if those revisions are the original edition.

Flynn told the judge that she did not think that Paragraph L applied to the statutory claims because she never expressed any unwillingness to make the revisions herself. Therefore, she said that the court should instruct the members of the jury that contract interpretation is a factual matter and that it is their job to interpret the language. Although AK Peters agreed that the court should leave the interpretation of Paragraph L up to the jury, it said that if the jurors were to conclude that Paragraph L applied, they should be instructed to apply each sentence of the contract as they found the facts. The court brought the jury into the courtroom and the following colloquy ensued:

> THE COURT: I understand the first sentence of Paragraph L, which says that the author/editor agrees to revise the work when the publishers will decide and so forth to mean as follows: That the publisher has the right to decide that

a revision is desirable. And if he does, the author/editors agree to revise the work and to deliver a revised version within a reasonable period of time.

In addition, it's important to note that the last sentence of Section L states that all terms of this agreement shall apply to each revision as though it were the work being published for the first time. So the same rules apply to the revision as to the first one.

Does that explanation help you? Or are there –

A JUROR: No, there's more.

THE COURT: I'm sorry?

JURY FOREPERSON: I guess they're saying it was the middle line, Your Honor.

THE COURT: The middle?

A JUROR: It says if the editor/author is not willing, available-the publisher has the right to do something.

THE COURT: Yes. Oh, I see what you mean. It says, Should the author/editor be unable or unwilling to undertake such revision or be deceased, which doesn't apply there, the publisher may arrange an agreement with the author not to be unreasonably withheld for the preparation of a revised manuscript.

Now, do you have a question about the meaning of that?

A JUROR: Yes.

THE COURT: As I read it, what it means is that if the author won't do what the first sentence says he agrees to do or is

> unable to do so, then the publisher may
> do so.
>
> Now, the question is a little more
> complicated in this case by the fact that
> there were two authors to begin with. And
> one of them, Mr. Jones, clearly did agree.
> And Ms. Flynn contends that she didn't
> agree.
>
> I don't think I can aluminate [sic] any
> more than I have with as much
> experience as I've had with this sort
> of-does that help?

A JUROR: Yes.

THE COURT: Okay. Please return and go ahead.

Neither party objected to this instruction, and the jury returned to its deliberations.

Flynn now claims that the court's instruction contained significant prejudicial errors. She argues that the court failed to instruct the jury that the relevance of Paragraph L to the dispute was a factual matter that the jurors had to resolve for themselves, that it misstated the facts by saying that Flynn "contends she did not agree" to undertake a revision, and that its interpretation of the contract foreclosed the possibility that the jury could have concluded that her refusal to consent to the changes to the book, including the addition of Seiger as a co-author, was reasonable.

While we agree that the district court's instruction was problematic,[10] Flynn's failure to object when the court issued the instruction constituted a forfeiture of her right to object on appeal. See Fed. R. Civ. P. 51(c) (stating that a party must "object[] promptly after learning that the instruction or request will be, or has been, given or refused"); Gray v. Genlyte Group, Inc., 289 F.3d 128, 134 (1st Cir. 2002)("[E]ven if the initial request is made in detail, the party who seeks but did not get the instruction must object again after the instructions are given but before the jury retires for deliberations.") (emphasis in original). As we have previously observed, "[o]ur interpretation of Rule 51 is quite strict." Connelly v. Hyundai Motor Co., 351 F.3d 535, 544 (1st Cir. 2003). There is a good reason for this strictness. We enforce our object-or-forfeit rule "to compel litigants to afford the trial court an opportunity to cure [a] defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." Cross v. Cleaver, 142 F.3d 1059, 1068 (8th Cir. 1998) (citation and internal quotation marks omitted).

---

[10]Flynn's primary breach argument was that the publisher, contrary to the requirement of Paragraph L, never presented to her the revisions that were contemplated. In short, she was never given a chance to agree or disagree. The court's instruction seemed to miss this nuance. The court's instruction also seemed to obscure the right of the authors reasonably to withhold their agreement to revisions.

-26-

Flynn argues that we should not apply our object-or-forfeit rule here because she did not have an opportunity to object.[11]  "As a practical matter," she says, "there was no way to make an objection in the time between the Court's question 'does that help?', the juror's response 'Yes', and the Court's 'Okay. Please return and go ahead.'" We disagree.  Even in the absence of an inquiry from the judge about objections from counsel to the court's answers to the jurors' questions, she could have and should have objected after the judge finished his instruction but before the jurors left the courtroom.  Whatever discomfort counsel may have felt about objecting without an invitation, such a response is required if litigants want to preserve their rights.  As the D.C. Circuit noted in its response to a litigant in similar circumstances:  "We think he was under the duty to object and, even at the risk of incurring the displeasure of the trial court, to insist upon his objection.  Having failed to do so, it is too late to urge this as error here." Phillips v. Kitt, 290 F.2d 377, 378 (D.C. Cir. 1961) (per curiam).

## D.  **Attorney's Fees**.

California Civil Code section 3344, one of the statutes under which Flynn filed her claims, includes a fee-shifting

---

[11]Flynn also argues that Rule 51 does not apply because it was up to the jury to interpret the contract and because the court's interpretation of the contract was incorrect as a matter of law. Her argument confuses an argument on the merits with an argument as to whether we should consider the merits.

provision: "[T]he prevailing party in any action under this section shall also be entitled to attorney's fees and costs." Flynn pleaded in her complaint that she intended to seek attorney's fees, but AK Peters did not inform her of its intention to do so until the parties met in the judge's chambers to discuss the jury charge. Flynn claims that this delay constituted a forfeiture of AK Peters' right to seek fees under the statute. Even if the publisher did not forfeit its claim to fees, she argues that the court's award of $55,000 was unreasonably generous and should be reduced.

In support of her forfeiture claim, Flynn argues that attorney's fees sought by a prevailing defendant are "special damages" within the meaning of Fed. R. Civ. P. 9(g),[12] and that AK Peters forfeited its right to seek special damages by not stating its intention to do so in its answer to her complaint. The district court rejected this novel argument, holding that Fed. R. Civ. P. 54(d)(2)[13] alone governed AK Peters' claim for attorney's

---

[12]Fed. R. Civ. P. 9(g) states: "When items of special damage are claimed, they shall be specifically stated."

[13]Fed. R. Civ. P. 54(d)(2) states, in pertinent part: 2) Attorneys' Fees.

(A) Claims for attorneys' fees and related nontaxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed no later than 14 days

fees.  On appeal, Flynn fails to cite any authority demonstrating that, under California law, litigants must prove the right to section 3344 attorney's fees as a separate element of damages, and we have not been able to locate such authority.  Concluding that Rule 54(d)(2) controls this case, we affirm the district court's conclusion that AK Peters did not forfeit its right to seek attorney's fees.

We review the court's determination regarding the reasonableness of the prevailing party's attorney's fee request for "manifest abuse of discretion" and, barring legal errors, "we will set aside a fee award only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them."  Poy v. Boutselis, 352 F.3d 479, 488 (1st Cir. 2003) (internal quotation marks omitted).

Flynn does not object to the rate that AK Peters' attorney charged, which the publisher's attorney claimed was below market rates, nor does she claim that AK Peters' attorney billing

after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

records were not sufficiently specific.  Instead, noting that only ten percent of the pleadings were directly related to the section 3344 claim and that the attorneys only referenced section 3344 in billing entries totaling $6,417, she argues that she should only be responsible for ten percent of AK Peters' legal costs.  The district court rejected this argument, concluding that the complexity and length of the litigation justified the fees.  It specifically noted that the bills represented two years of legal work defending Flynn's section 3344 claim and that AK Peters did not present bills for expenses that it incurred while defending the claim in the California court.  Most importantly, in our view, the consent issue that was integral to the section 3344 claim was also common to all of the claims.  Therefore, we reject her argument that there was an abuse of discretion in the district court's fee award.

**<u>Affirmed.</u>**