# United States Court of Appeals
## For the First Circuit

No. 09-1082

ALTHEA BOOKER,

Plaintiff, Appellant,

v.

MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH (THE LEMUEL SHATTUCK
HOSPITAL); THE EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES;
EDWARD NICOSIA,

Defendants, Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Mark Booker, with whom Law Offices of Mark Booker was on
brief, for appellant.
Daniel G. Cromack, Assistant Attorney General, with whom
Martha Coakley, Attorney General, and Bryan R. Killian, Assistant
Attorney General, were on brief, for appellee.

July 15, 2010

**LIPEZ, Circuit Judge**. Plaintiff Althea Booker filed suit against her employer, the Massachusetts Department of Public Health (the Lemuel Shattuck Hospital), the Executive Office of Health and Human Services, and certain individual defendants. A jury returned a verdict in favor of defendants on Booker's claims of retaliation under federal and state law, see 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4), and tortious interference with contractual employment relations. The court then denied Booker's post-trial motions.

On appeal, Booker first contends that the court's jury instruction on the meaning of a "materially adverse action" misstated the legal standard governing her retaliation claim. Although we conclude that the adverse action instruction was problematic, we reject that claim of error.

Booker also argues that the court erroneously refused to instruct the jury on the doctrine of spoliation. Booker requested an instruction that the jury could draw an adverse inference based on the deletion of emails concerning Booker by certain hospital employees. We conclude that Booker failed to lay a proper evidentiary foundation for a spoliation instruction and therefore the court did not abuse its discretion in refusing to give it. Accordingly, we affirm the judgment.

**I.**

Booker, an African-American woman, began working at the Lemuel Shattuck Hospital (the hospital) as a telephone operator in the late 1980s. In 2001, she was promoted to "Communications Dispatcher II." Booker's responsibilities in her new position included dispatching the hospital's campus police officers and supervising the telephone operators, or "Communication Dispatcher I's," who staffed the communications department. The communications department performed functions such as screening and receiving incoming calls, transferring calls to other departments, receiving emergency calls from within the hospital, assisting with dispatching, and greeting visitors.

On September 9, 2003, Booker met with Shawn McMullen, then her immediate supervisor, and Edward Nicosia, then the hospital's Deputy Director of Facilities Management,[1] to express concern that she was receiving telephone calls from her staff while she was off duty. Nicosia explained that under her collective bargaining agreement she was entitled to "call-back pay" for work-related calls received at home. Later that day, Nicosia and McMullen circulated a memorandum to Booker's staff discouraging them from calling their supervisor at home except in emergency situations, and copied Booker.

---

[1] Later in 2003, Nicosia became the Acting Director of Facilities, and sometime in the end of 2004 or beginning of 2005, he became the Director of Facilities.

-3-

Several months later, on December 15, 2003, Booker hand-delivered a letter to Nicosia complaining that the hospital had discriminated against her based on race by failing to compensate her for off-duty calls. In the letter, Booker asserted that she was owed call-back pay for seventy-five calls she had received at home over the past two years, and that McMullen, who is white, was receiving off-duty calls from Booker's staff that should have gone to her. She stated that the sole reason for this unequal treatment was race and that her letter represented "a relatively whispering salvo in what could become a vigorous public challenge of rampant institutional racism at the Hospital."

Later that same day, Booker confronted McMullen in the campus police department, located in the hospital's main lobby. In a raised voice, Booker asked McMullen why members of her staff were calling him after hours instead of her and whether the hospital had a policy of only paying white supervisors for off-duty calls. She asserted that this was racism and she would speak with a lawyer. In early January 2004, Nicosia and McMullen had a meeting with Booker to discuss the December 15 incident. Booker apologized for confronting McMullen in such a public setting, but did not retract her complaints. Ultimately, in late January, she was issued a written warning for her behavior. On February 6, 2004, Booker filed the first of several administrative complaints with the Massachusetts Commission Against Discrimination (MCAD) and the

Equal Employment Opportunity Commission (EEOC), alleging race discrimination and retaliation.[2]

In the months that followed Booker's December 15 letter of complaint, Nicosia took several actions related to payroll and timekeeping procedures that displeased Booker. In January 2004, Nicosia removed the communications logbook from Booker's desk and replaced it with a new logbook. Members of the communications department used the log to record information such as shift assignments, staff absences, and phone calls to staff at home, and the logbook removed by Nicosia contained entries related to Booker's claim for call-back pay. The following month, Booker and Nicosia had a disagreement about allocation of personal time. Noticing that Booker had missed twelve hours of work but had not reported the absences on her timesheet, Nicosia deducted twelve hours of her personal time. When Booker discovered this deduction, she informed Nicosia that she preferred to use a combination of sick time, vacation time, and leave without pay to cover the time off. Although Nicosia asked Booker to make this correction by submitting a payroll adjustment form, she instead called the payroll department and had them make the change. After discovering that Booker made the payroll change without the appropriate paperwork, Nicosia submitted a payroll adjustment form again

[2] Booker filed a second administrative complaint for retaliation in May 2005 and a third administrative complaint sometime thereafter.

designating Booker's absences as personal time. Booker complained, but Nicosia refused to have her personal time returned.

Finally, in February 2005, Nicosia learned that Booker was logging her time in the communications log and reviewing her own timesheets as well as those of her staff. Nicosia directed Human Resources to make changes so that Booker was required to enter her time in the so-called steward's log and submit her weekly timesheets to her immediate supervisor for review.

Changes were also made to Booker's job responsibilities over the 2004-2005 period. In the fall of 2004, Richard Wong joined the hospital as the director of safety and security and replaced McMullen as Booker's immediate supervisor. Sometime thereafter, Wong hired additional police officers and informed Booker that whenever at least five officers were on duty, an officer would perform dispatching duties. Booker continued to fill in as a dispatcher on an as-needed basis, around four or five times per month, but it was no longer a regular part of her job duties. Wong also requested that Booker get trained to perform mailroom duties, which consisted of sorting incoming mail in the morning and metering outgoing mail in the afternoon, so that she could cover the mailroom on occasion. Other employees, including Wong, covered the mailroom when the regular mailroom clerk was out, and the job description for Booker's position, Communications Dispatcher II, listed sorting and delivering mail as one of her job

responsibilities. However, Booker refused the mailroom training and resisted performing mailroom duties, viewing them as less prestigious than her other duties. As a result, she rarely covered the mailroom, filling in there for the first time on December 30, 2005.

Finally, in June 2005, Booker was suspended for one day without pay following a confrontation with a campus police officer. The officer, hurrying to get to an assigned location at the hospital on time, exchanged his radio for the radio on Booker's desk, which had a belt clip. Raising her voice, she chastised him for taking her radio and called him derogatory names. People passing through the busy hospital lobby observed the incident.

In October 2005, Booker filed this action in federal district court against the Massachusetts Department of Public Health (DPH), the Executive Office of Health and Human Services (EOHHS), and four individual defendants, including Nicosia.[3] Booker alleged, inter alia, that defendants retaliated against her for complaining about discriminatory withholding of callback pay and for filing complaints with the MCAD,[4] and that the individual

---

[3] The individual defendants named in the complaint were Nicosia, McMullen, the hospital's Executive Director Paul Romary, and Director of Labor Relations Jennifer Foley.

[4] Although Booker brought her retaliation claims under both state and federal law, the parties have not suggested that the state and federal antiretaliation provisions differ in any way material to the issues on appeal. Therefore, we focus our analysis on the standards for retaliation under Title VII and do

-7-

defendants intentionally interfered with her contractual employment relationships. Following pretrial dispositions not at issue in this appeal,[5] Booker proceeded to trial on her retaliation claims against DPH, EOHHS and Nicosia (hereafter, defendants), and her tortious interference claim against Nicosia.

At trial, the court instructed the jury as to the actions that Booker maintained were retaliatory:

> [T]he written warning issued in January of 2004; the removal of the communications logbook from the desk where she worked; the February 2004 incident involving Mr. Nicosia's reduction of her personal time for an unreported absence; the requirement that she sign for her time on the stewards' log rather than the communication dispatchers' log; the reduction in her police dispatching duties; her assignment to mailroom duties and training, and her one-day suspension in June of 2005.

After a five-day trial, the jury returned a verdict in favor of the defendants on all claims. The district court denied Booker's post-judgment motions for judgment as a matter of law and for a new trial. On appeal, Booker contends, as she did in her

---

not separately analyze the analogous retaliation provision under state law, Mass. Gen. Laws ch. 151B, § 4(4).

[5] The court granted summary judgment in favor of defendants on Booker's claims for racial discrimination, interference with the right to be free from discrimination, and aiding, abetting, inciting or compelling discrimination. Booker voluntarily dismissed her claims for libel and intentional infliction of emotional distress against all defendants, and dismissed her tortious interference claim against all defendants except Nicosia. Finally, the court dismissed all remaining claims against Romary, Foley and McMullen.

motion for a new trial, that (1) the district court improperly instructed the jury on the required showing of a materially adverse action for purposes of her retaliation claim, and (2) the court erred in refusing to give a spoliation jury instruction.  We address each contention in turn.

**II.**

## A. Retaliation Jury Instruction

At trial, the district court instructed the jury on the requisite showing of a materially adverse action under Title VII:

> Under federal and state law, Ms. Booker must prove . . . by a preponderance of the evidence . . . that the desire to retaliate because of [her complaints of discrimination] was a motivating and determinative factor in any decision to alter Ms. Booker's terms and conditions of employment in a materially adverse manner . . . .
>
> An employment action <u>to be adverse must materially change the terms and conditions of the plaintiff's employment</u>. Examples the law gives include demotions, disadvantageous transfers or assignments, the loss of promotions, unwarranted negative evaluations, toleration of harassing conduct by co-employees, <u>and reprisals intended to discourage other employees from complaining about unlawful practices or reprisals that might be perceived in that way by other employees looking at them reasonably</u>.

(Emphasis added.)[6]

---

[6] The next paragraph of the instructions described what were not adverse actions, though this portion of the instruction is not at issue:

> Adverse job actions do not include hurt feelings, subjective disappointments,

Booker contends on appeal that this instruction misstated the legal standard applicable to her retaliation claim as set forth in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). First, she contends that the instruction erroneously required a showing that an adverse action affect the terms and conditions of her employment. Second, she argues that the final phrase in the exemplary list of adverse actions, beginning with "and reprisals," improperly required her to demonstrate that the reprisals be intended to discourage, or reasonably be perceived as intended to discourage, employee complaints.

1. Standard of Review

A party who objects to an instruction must "stat[e] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). Under the procedure outlined in Rule 51, before the trial court charges the jury it must inform the parties of its proposed instructions and receive any objections. Fed. R. Civ. P. 51(b); Surprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005). An objection made at that time "preserves the underlying issue for appeal." Surprenant, 424 F.3d at 15 (emphasis added) (citing Fed. R. Civ. P. 51(c)(2)(A)). If,

disillusionment over an employer's actions, or expected losses of job function or responsibilities because of a business or corporate reorganization. It also does not [in]clude everyday workplace banter or teasing, which all of us are familiar with.

-10-

however, a party is "not informed of an instruction or action on a request" during the precharge conference, the party may object "promptly after learning that the instruction or request will be, or has been, given or refused." Fed. R. Civ. P. 51(c)(2)(B). The requirements of Rule 51 "are not to be taken lightly" and "there is a high price to be paid for noncompliance." DeCaro v. Hasbro, Inc., 580 F.3d 55, 60 (1st Cir. 2009). Failure to comply with the rule ordinarily results in forfeiture of "the objection to which the failure relates," and we review forfeited objections only for plain error. Id. (citing Fed. R. Civ. P. 51(d)(2)). Our strict enforcement of the object-or-forfeit rule serves "to compel litigants to afford the trial court an opportunity to cure [a] defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." Flynn v. AK Peters, Ltd., 377 F.3d 13, 25 (1st Cir. 2004) (quotation marks and citation omitted).

In this case, the court discussed its tentative jury instructions with the parties at a sidebar conference held before the jury was charged.[7] The court stated that it planned to add, at the end of the adverse action instruction, the phrase "Reprisals intended to discourage other employees from complaining about unlawful practices." Booker's counsel objected, stating:

---

[7] The court's tentative instructions apparently were not made part of the record.

-11-

> I am concerned that, as I heard the instruction, that the employer intended to deter other employees, I don't think it's necessary that he intended to deter, so long as it was reasonably foreseeable that it would deter. In other words, I don't believe there is an intention requirement as to the deterrence. It's only that it be a deterrent. He must intend to retaliate but the effect must, in effect, deter a reasonable employee, not that he intended to deter others. . . .
>
> The <u>Burlington</u> Court, talked about and used language, "an adverse action consists of any action that may dissuade a reason[able] employee from engaging in protected activity."

In response, the court noted that it "might add, 'Or reasonably would have been perceived by the employe[e],' but I just don't want to turn this into a strict-liability tort." Booker's counsel did not voice any further objection. The court gave the modified instruction to the jury, stating that examples of adverse actions include "reprisals intended to discourage other employees from complaining about unlawful practices <u>or reprisals that might be perceived in that way by other employees looking at them reasonably</u>." (Emphasis added.) The court held a sidebar conference after the charge, inviting any "[]new" objections, but Booker's counsel raised no objection to the instruction as given.

As this account makes clear, Booker never objected in the district court on the first ground she presses on appeal -- that the instruction improperly stated that an adverse action must "materially change the terms and conditions of the plaintiff's employment." That objection is therefore forfeited. <u>See</u> <u>Boston</u>

-12-

Gas Co. v. Century Indem. Co., 529 F.3d 8, 19 (1st Cir. 2008) (holding that objection was forfeited where party made an objection to court's proposed instruction, but on grounds unrelated to the aspect it criticized on appeal).

Booker did object at the precharge conference on the ground that the tentative instruction improperly required that a materially adverse action be intended to discourage employee complaints. However, the court then proposed adding instructional language to address Booker's concern, and Booker did not object after being apprised of the court's proposed modification or after hearing the modified instruction given to the jury. The "purpose of a sidebar objection is to inform the judge exactly what he got wrong and what he should do to remedy the incipient harm." DeCaro, 580 F.3d at 61. By failing to object to the modified instruction either before or after the charge, Booker failed to inform the court that she believed the instruction was still problematic, specify the grounds for her objection, or give the court an opportunity to correct any error. Therefore, this objection is also forfeited. See, e.g., Kirk v. Reed Tool Co., 247 F. App'x 485, 486 (5th Cir. 2007) (per curiam) (unpublished) ("[W]hile [plaintiff] may have objected to the original jury charge, he did not object to the supplemental charge. Therefore, our review is only for plain error."); Cooney v. Booth, 28 F. App'x 148, 151 (3d Cir. 2002) (unpublished) (reviewing instruction for plain error

-13-

because "absent a specific objection following the actual charge, [the court] had no way of knowing that its efforts to accommodate the general objection made at the [precharge] conference had not been wholly successful").[8]

Noting that Rule 51 was amended effective December 1, 2003, Booker argues that her objections were properly preserved under the amended rule. We have acknowledged that the 2003 amendments to Rule 51 made changes to the procedure for lodging objections. Under the former version of the rule, objections were not preserved unless they were "taken at sidebar after the trial judge had charged the jury." Surprenant, 424 F.3d at 15 n.3 (emphasis added). Thus, even if a party properly objected to a proposed instruction prior to the jury charge and the court then gave the challenged instruction, that objection was forfeited unless the party renewed the objection after the jury charge. See, e.g., McGrath v. Spirito, 733 F.2d 967, 968-69 (1st Cir. 1984). We have also noted that the 2003 amendments "were designed in part to ease the burden on parties in preserving their objections to instructions where the district court had already made a definitive ruling, on the record, rejecting a request for a particular instruction." Colón-Millín v. Sears Roebuck De Puerto Rico, Inc., 455 F.3d 30, 40 n.7 (1st Cir. 2006). However, the 2003 amendments

---

[8] Although the cited opinions are unpublished, we rely on them for their persuasive value.

do not assist Booker here. Nothing in the amended rule suggests that a party may preserve a claim of error by objecting to a tentative instruction at the precharge conference, but then failing to object after the instruction is modified to accommodate the initial objection.[9]

Therefore, we review the legal standards stated in the jury instructions only for plain error. In doing so, we bear two precepts in mind. The first is that the district court has wide discretion over the particular words it chooses to convey those standards. See Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 378 (1st Cir. 2004); Interstate Litho Corp. v. Brown, 255 F.3d 19, 29 n.11 (1st Cir. 2001). The second is that jury instructions must be viewed as a whole. See Hopkins v. Jordan Marine, Inc., 271 F.3d 1, 4 (1st Cir. 2001).

2. Analysis

In order to make out her retaliation claim under Title VII, Booker had to show that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3)

---

[9] Booker also argues that she did not object at the postcharge conference because the district court stated that it would hear only "[]new" objections, and she had already objected to the adverse action instruction at the precharge conference. However, Booker's earlier objection was made to the court's tentative instruction, not to the revised instruction intended to accommodate her concerns, and thus Booker's objection to the newly modified instruction would have been new. Moreover, counsel had a duty to object "even at the risk of incurring the displeasure of the trial court." Flynn, 377 F.3d at 25 (internal quotation marks and citation omitted).

-15-

the adverse action was causally linked to her protected activity." Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007). In Burlington, the Court clarified the legal standard for the required showing of an adverse action under Title VII's antiretaliation provision. Burlington first addressed the question of whether the antiretaliation provision "forbids only those employer actions and resulting harms that are related to employment or the workplace." 548 U.S. at 61. Recognizing that an employer can effectively retaliate against an employee through actions "not directly related to his employment or by causing him harm outside the workplace," the Court held that Title VII's antiretaliation provision, unlike the statute's substantive antidiscrimination provision, "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 63-64.

The Court next addressed the question of "how harmful an act of retaliatory discrimination must be in order to fall within the provision's scope." Id. at 61. The Court held that the antiretaliation provision covers those "employer actions that would have been materially adverse to a reasonable employee," that is, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57. Thus, whether an action is materially adverse is judged by an objective rather than a subjective standard. Id. at 68-69.

Relying on <u>Burlington</u>, Booker primarily challenges the final clause of the adverse action instruction, "reprisals intended to discourage other employees from complaining about unlawful practices or reprisals that might be perceived in that way by other employees looking at them reasonably."

Booker claims that the first clause -- "reprisals intended to discourage other employees" -- erroneously conflated the adverse action element of a Title VII claim, which she says does not look to the employer's intent, with the retaliation element, which considers the employer's retaliatory motive. She concludes that the instruction imposed a higher burden of proof on the adverse action element by requiring her to show that her employer's intent was to discourage other employees' complaints. <u>Burlington</u>, Booker says, only required her to show that the employer's actions might dissuade a reasonable employee from complaining of discrimination.

While the language in this phrase of the instruction was awkward and created numerous potential issues, including some not raised by Booker,[10] we cannot say that the instruction on adverse

_____

[10]	Though Booker claims that this clause of the instructions imposed a higher burden of proof on her to show adverse action, that is not necessarily the case. The clause could, for instance, be read to allow a jury to find liability based on intent without materiality, a standard that would lessen Booker's burden.

action was error. When evaluating claims of error in jury instructions, our task is not to parse particular phrases, but to look at the instructions as a whole in light of the relevant standard of review. Taken together, the adverse action instructions were not so clearly divergent from the Burlington standard as to constitute plain error.

The challenged portion of the instruction was part of a longer sentence listing examples of materially adverse actions; it was not the lone basis given to the jury to understand the legal definition of an adverse action. Whatever objection there might be to the challenged phrase of the "reprisals" portion of the instruction, the instruction was saved by the alternative formulation at the end of the sentence: "or reprisals that might be perceived in that way by other employees looking at them reasonably."

Given its placement, the likely reading of the final phrase (and the meaning ascribed to it by the district court) was that it referred to "reprisals that might be perceived in that way [that is, as discouraging complaints about unlawful practices] by other employees looking at them reasonably."

That interpretation accurately captures the Burlington standard: it conveys that the standard is an objective one, based on the vantage of a reasonable employee, and that the critical inquiry is whether the reprisals might deter a reasonable employee

from complaining of discrimination. That interpretation is also reinforced by the context of this phrase in relation to the rest of the jury instructions: it immediately preceded a paragraph further explaining to the jury that adverse actions did not include things like "hurt feelings" and "subjective disappointments" that might dissuade a hyper-sensitive employee but would not deter a reasonable employee. Viewed as a whole, the adverse action instruction was not plainly erroneous. We do, though, recommend that instructions on retaliation hew more closely to Burlington and Dixon.

> b. Instruction's Language that "Employment Action to be Adverse Must Change the Terms and Conditions" of Employment

Booker also contends that the adverse action instruction erroneously stated that an adverse action must "change the terms and conditions of the plaintiff's employment." However, while Booker correctly notes that the antiretaliation provision of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment," Burlington, 548 U.S. at 64, the district court was entitled to tailor its instruction to the evidence presented at trial. Each of the allegedly retaliatory acts against Booker, including written warnings, personal time allocation, modifications in payroll procedures, changes or reductions in job duties, and suspension without pay, were related to her employment and occurred at the workplace. Cf. Burlington,

-19-

548 U.S. at 63-64 (citing examples of actionable retaliation causing harm "<u>outside</u> the workplace," including FBI's refusal to investigate death threats against employee and employer's filing of false criminal charges against former employee). On the facts of this case, the court properly confined its instruction to workplace-related actions. Therefore, we cannot say that this portion of the instruction was erroneous.

## B. Spoliation Jury Instruction

Booker next contends that the court erred in refusing to instruct the jurors that they could draw an adverse inference if they found that defendants destroyed documents relevant to Booker's claims.

### 1. Evidence and Requested Instruction on Spoliation

At trial, Booker cross-examined three hospital employees about their deletion of email correspondence concerning Booker. Wong, who became Booker's immediate supervisor in the fall of 2004, testified that shortly after he began working at the hospital, he was informed that Booker had filed an administrative complaint against the hospital and that it was possible he could become a defendant, although he did not know the subject matter of her claims. Wong further testified that he regularly deleted all of the emails in his "sent" and "deleted" email folders every thirty days, and did not do anything in particular to preserve emails concerning Booker. Paul Romary, the hospital's executive director,

-20-

testified that he received a copy of Booker's December 2003 letter of complaint. He explained that he received a hundred emails a day, some of which he deleted, and made no special effort to preserve his emails concerning Booker. Barbara McLaughlin, an executive vice president of the hospital and Wong's supervisor beginning in December 2005, testified that she never deleted any emails concerning Booker.

Prior to trial, Booker submitted a proposed jury instruction on the spoliation of evidence:

> If the evidence indicates that a party has destroyed records relevant to a pending lawsuit or that may be relevant to a lawsuit that could arise in the future, you may reasonably infer that the party probably did so because the records would harm its case. The non-destroying party need not have offered direct evidence of a cover-up for you to infer that the party who destroyed evidence did so because the records were unfavorable to its position or would harm its case.

The court refused to give the requested instruction, and Booker recorded her objection at the precharge conference. In its order denying Booker's motion for a new trial, the court again rejected Booker's claim that the jury should have been given the spoliation instruction. The court reasoned that "because Booker did not present any evidence at trial that Wong or defendants engaged in the deliberate spo[li]ation of evidence, no instruction on an adverse inference was merited. Indeed, such an instruction would have been misleading and prejudicial to defendants."

-21-

2. Legal Framework on Spoliation

Where a proper evidentiary foundation has been laid, "a trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party." Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998); see also Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc., 692 F.2d 214, 217-218 (1st Cir. 1982) (Breyer, J.). This adverse inference is based in part on the commonsense observation that a party who "destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." Testa, 144 F.3d at 177; accord Nation-Wide Check, 692 F.2d at 218. The inference is also based on prophylactic and punitive rationales: it serves to deter litigants from destroying relevant evidence prior to trial and to penalize a party whose misconduct creates the risk of an erroneous judgment. Nation-Wide Check, 692 F.2d at 218.

Before an adverse inference can arise, the sponsor of the inference must lay an evidentiary foundation, proffering evidence sufficient to show that the party who destroyed the document "knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim." Testa, 144 F.3d at 177; see also id. at 178 (noting that

-22-

adequate foundation depends upon evidence of "institutional notice -- the aggregate knowledge possessed by a party and its agents, servants and employees").  A spoliation instruction is not warranted absent this threshold showing, because the trier of fact would have no basis for inferring that the destruction of documents stemmed from the party's consciousness that the documents would damage his case.

A "trial court's decision to give or refuse an adverse inference instruction is reviewed for an abuse of discretion." Gilbert v. Cosco, 989 F.2d 399, 406 (10th Cir. 1993); see also United States v. St. Michael's Credit Union, 880 F.2d 579, 597 (1st Cir. 1989) (stating that trial court's decision to give or refuse missing witness instruction is committed to its sound discretion).

3. Analysis

As an initial matter, Booker argues that the district court applied the wrong legal standard when it stated that because there was no evidence presented at trial that "Wong or defendants engaged in the deliberate spo[li]ation of evidence, no instruction on an adverse inference was merited."[11]  However, we understand the

_____

[11] We note that at the earlier precharge conference, in response to Booker's objection to its refusal to give the spoliation instruction, the court stated: "I think the law is clear that I don't have to instruct on that.  I just have to permit argument if there is a basis for it from the evidence." On appeal, the parties do not challenge the propriety of the court's suggestion that Booker could argue for an adverse inference to the jury.  Therefore, we take no position on whether a court can properly decide that there is sufficient evidence to permit the

-23-

district court's reference to "deliberate" spoliation as simply a shorthand for the evidentiary foundation required to support an adverse inference. In other words, the district court concluded that Booker failed to make the required threshold showing that defendants destroyed emails (or permitted their destruction) while on notice of Booker's claims and the emails' potential relevance to those claims. Therefore, the jury would have no basis for inferring that defendants destroyed the emails "out of a sense that the document's contents hurt [defendants'] position," and so a spoliation instruction was not warranted. Testa, 144 F.3d at 177; see also Nation-Wide Check, 692 F.2d at 219.

Booker further contends that the court erred in finding that she failed to lay an adequate foundation for a spoliation instruction. She contends that she produced sufficient evidence at trial to prove that at the time defendants deleted the emails (or permitted their destruction), they had knowledge both of her claims against them and of the emails' potential relevance to those claims.

We conclude that the court did not abuse its discretion in concluding that the evidence at trial was insufficient to merit a spoliation instruction. Booker presented no evidence that

_____

parties to argue for an adverse inference to the jury, while at the same time declining to give a spoliation instruction. In this case, our focus is on whether the court correctly concluded that the evidence at trial was insufficient to support a spoliation jury instruction.

McLaughlin deleted any emails concerning her, whether potentially relevant or not. Indeed, McLaughlin testified repeatedly that although she sometimes deleted emails, she never deleted any emails concerning Booker. Booker did elicit testimony from Wong and Romary that they regularly deleted their emails and may have deleted some concerning her. However, she proffered no evidence that any of those emails were even potentially relevant to her claims in this case, or that defendants knew of their potential relevance. Although permitted to cross-examine Wong and Romary about their deletion of emails, Booker did not question either witness about the content of the deleted emails or about whether the emails were relevant to her claims.

Furthermore, unlike many spoliation cases, this is not a case in which a document's potential relevance to the plaintiff's claims is apparent from the nature of the missing document itself. See, e.g., Testa, 144 F.3d at 177 (finding notice of potential relevance where company destroyed purchase order for delivery on date of plaintiff's injury, and company's "defense from the start was anchored on the premise that it had no reason to anticipate any deliveries on the day in question"); Blinzler v. Marriot Int'l, Inc., 81 F.3d 1148, 1158-59 (finding notice of potential relevance where hotel destroyed log of outgoing phone calls from day of hotel guest's death, and hotel knew of guest's death and of plaintiff

-25-

spouse's "persistent attempts" to discover when the hotel placed the call for emergency aid).

In sum, Booker produced evidence showing merely that two hospital employees, Wong and Romary, routinely deleted their emails, some of which may have concerned her. She produced no evidence that defendants destroyed emails with knowledge that the emails were potentially relevant to her claims in this case. Because Booker failed to establish the required evidentiary foundation for an adverse inference, the court properly concluded that a spoliation instruction was not warranted.[12]

**III.**

For the foregoing reasons, the judgment is <u>affirmed</u>.

---

[12] Booker also notes that Wong testified that he discarded a United States Coast Guard Manual, which, she contends, was relevant to her claims because he relied on it for his decision to reallocate police dispatching duties at the hospital. However, the manual was not unique and, to the extent it was relevant, Booker could have obtained a copy of the publication from the Coast Guard. The court did not abuse its discretion in not permitting an adverse inference based on the discarded manual.