# United States Court of Appeals
## For the First Circuit

No. 03-2718

BRUCE BARON,

Plaintiff, Appellee,

v.

SUFFOLK COUNTY SHERIFF'S DEPARTMENT; SHERIFF OF SUFFOLK COUNTY,

Defendants, Appellants,

DANIEL HICKEY,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Cyr, Senior Judge,
and Lipez, Circuit Judge.

Kathleen M. Cawley, Assistant General Counsel, Suffolk County
Sheriff's Department, for appellant.
Carolyn M. Conway, with whom DiMento & Sullivan was on brief,
for appellee.

March 29, 2005

**LIPEZ**, **Circuit Judge**. Plaintiff Bruce Baron, a former corrections officer at the Suffolk County House of Correction, was allegedly harassed and forced to quit his job after he broke a code of silence by reporting a fellow officer's misconduct. He sued corrections officer Daniel Hickey, the Suffolk County Sheriff's Department ("Department"), and Suffolk County Sheriff Richard Rouse for civil rights violations stemming from that harassment. The district court awarded summary judgment for Rouse on the grounds of qualified immunity but denied summary judgment for the Department. Following a four-day trial, the jury returned a verdict against the Department and awarded Baron $500,000 in damages. The jury also found that Hickey was liable for tortious interference with Baron's contractual relationship with the Department but that the specific harassment claims against him were time-barred; the jury awarded no damages against Hickey.

The Department then moved for judgment as a matter of law, as well as for a new trial and a remittitur of damages. The court denied these motions. The Department now appeals. Reviewing its claims, we find only one arguable error in the extensive record -- namely, a jury instruction that did not identify a specific individual as the final policymaker who must have condoned the custom that violated Baron's civil rights. We conclude, however, that this forfeited claim does not dictate reversal of the jury verdict under the plain error test set forth in United States v. Olano, 507 U.S. 725, 735-36 (1993). Accordingly, we affirm.

-2-

We draw on the trial record for background, reciting the facts in the light most favorable to the verdict. See SEC v. Happ, 392 F.3d 12, 17 (1st Cir. 2004); Wennik v. Polygram Group Dist., Inc., 304 F.3d 123, 126 (1st Cir. 2002).

**A. Baron's employment at the House of Correction**

Baron began working as a corrections officer at the Suffolk County House of Correction in 1995. On January 27, 1997, while Baron was on duty, he and a supervisor, Sergeant Walsh, observed over a television monitor that another officer, Sergeant William Curtis, was playing cards with inmates in violation of the institution's policies. Walsh ordered Baron to call Deputy Superintendent Richard Feeney[1] to the unit and show him the monitor, where Curtis could still be seen playing cards. Baron complied, thereby essentially reporting Curtis's infraction. Curtis was suspended for three days as a result.

Almost immediately after this incident, Baron's colleagues began to harass him in retaliation for reporting Curtis's card-playing in violation of a tacit "code of silence" under which corrections officers refrain from reporting each other for policy violations. Among other things, the corrections officers shunned him at roll call and referred to him as a "rat." They displayed posters mocking Baron throughout the facility. One

---

[1]Feeney was promoted to Superintendent in October 1997 and retired from the Department in 2002.

poster accused him of being a child molester. During the summer of 1997, Baron also received harassing phone calls at work; once he left work to find that his car had been defaced with feces and his tires had been slashed.

Defendant Daniel Hickey, another corrections officer, was the chief instigator of the harassment, repeatedly threatening Baron and calling him a rat in front of inmates and other corrections officers. In one of their more heated encounters in September 1997, Hickey approached Baron in the cafeteria, said "Excuse me, this is for the rat fink," and threw cheese onto Baron's plate. He also called Baron a "low down Jewish rat bastard coward."

Baron verbally complained to his supervisors and to the Sheriff's Investigative Division (SID)[2] about such harassment on more than thirty occasions. Although Baron submitted at least eight written complaints to the SID detailing specific incidents, he did not keep copies of them and the SID produced only two in response to this litigation. In one written complaint filed on September 15, 1997, Baron reported that he had been harassed by Hickey for eight weeks and "did not know why he has a personal grudge against me." In the other written complaint in the record, dated September 16, 1997, Baron reported that "Hickey started harassing me about being a rat . . . and warning other officers

_____

[2]The SID is a division within the Department responsible for investigating allegations of officer misconduct.

-4-

that I may be monitoring them on camera." The September 16 report also recounted the cafeteria confrontation between Hickey and Baron.

SID investigator Neville Arthur collected reports from Department employees who had been present at the time of the confrontation in response to Baron's September 16 complaint. In contravention of Department policy, however, Arthur did not submit a final written report of his findings. Also in connection with Baron's complaints, a deputy superintendent interviewed Hickey and ordered him to leave Baron alone but did not discipline him. On another occasion, a supervisor responded to Baron's complaints by telling him to "be a man." Baron was ultimately transferred to the night shift in October 1997, but the harassment did not abate. Among other things, officers refused to cover his post for bathroom breaks, requiring him to relieve himself in a cup or in a yard adjacent to his post.

Over the ensuing months, as the harassment continued, Baron was charged with several violations of institution policy. In December 1997, a female inmate alleged that Baron had sexually assaulted her. Baron claims that Hickey encouraged the inmate's allegations in an effort to discredit him; a jury acquitted him on the assault charge. Baron was also suspended for five days and placed on employee probation for one year for giving food to an inmate in violation of prison policy. In February 1998, Baron collapsed at work from the stress of the harassment and had to be

taken to the hospital. He subsequently returned to work. In June 1998, Baron violated institution policy by directly informing the police of an inmate's claim that his girlfriend had been sexually assaulted, rather than immediately reporting the claim to the Department. Baron deviated from the internal reporting procedure because he did not trust his superiors in the Department in light of the ongoing harassment. As a result of the violation, Baron was presented with a settlement agreement under which he would be suspended for ten days. When Baron refused to sign the agreement because it inaccurately recounted the incident, his suspension was increased to twenty days. Baron did not serve the suspension because he called in sick between the time when it was imposed and September 3, 1998, when he resigned his position. Although the Department contends that he resigned specifically to avoid the suspension, Baron claims that he was forced to quit by the psychological toll of the ongoing harassment.

## B. Procedural history

In January 2001, Baron sued Hickey, Sheriff Rouse, and the Department in Suffolk County Superior Court, alleging, inter alia, that the retaliatory harassment he suffered for breaching the Department's code of silence forced his constructive discharge and violated his First Amendment and due process rights in violation of

42 U.S.C. § 1983[3] and state law.  The case was removed to federal district court in January 2001.

After several claims were dismissed on motions for summary judgment,[4] the claims against Hickey and the Department proceeded to trial in May 2003.  The defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) both at the close of

---

[3]42 U.S.C. § 1983 provides that:

> Every person who, under color of any . . . custom . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

[4]The court granted summary judgment for the Department on Baron's claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H & 11I, finding that it was "not cognizable under First Circuit precedents."  The court initially denied summary judgment on Baron's common law constructive discharge claim against the Department but later dismissed the claim upon the Department's motion for judgment as a matter of law, finding that the grievance procedures provided under Baron's collective bargaining agreement were his exclusive remedy for discharge.  Those rulings are not before us.
    The court also awarded summary judgment for Sheriff Rouse on the basis of qualified immunity:

> Plaintiff . . . has produced insufficient evidence to support a claim that the Sheriff acquiesced in the code of silence in 1997 and 1998. . . .  Thus, while there is evidence that the Suffolk County House of Correction had a widespread custom and practice of tolerating a code of silence, based on this record, I conclude that the Sheriff's hands-off management style did not arise [sic] to the level of willful blindness or deliberate indifference to the code of silence during the relevant time period.

Baron did not appeal this ruling.

Baron's case and at the close of evidence. In both cases, the court denied the motion.

Following the four-day trial, the jury returned a verdict against the Department, finding that Baron had proven that it had a policy that caused a violation of his civil rights, and awarded him $500,000 in damages. The jury found that the harassment claims against Hickey were time barred[5] but that he was liable for tortious interference with a contractual relationship.[6] The jury did not award any damages based on its tortious interference finding. Accordingly, the court entered judgment in favor of Hickey[7] and against the Department.

The Department now appeals, asserting a panoply of claims aimed at virtually every aspect of the district court proceedings. These claims essentially reduce to five major arguments. First, the Department challenges the district court's conclusion that Baron engaged in speech protected by the First Amendment. Second, it asserts that Baron did not establish a basis for municipal liability because there was no evidence of a custom of condoning a

---

[5]Because there was a three-year statute of limitations on the harassment claim against Hickey, the first question on the special verdict form asked the jury whether Baron proved that Hickey had harassed him past January 4, 1998. The jury answered that question in the negative.

[6]This finding was based on Baron's claim that Hickey's harassment improperly interfered with his performance of his employment agreement with the Department.

[7]Neither party appeals the judgment with regard to Hickey.

code of silence and retaliatory harassment, and that even if there was such a custom, Baron failed to demonstrate that a Department policymaker was aware of it. Third, the Department takes issue with the special verdict form given to the jury, arguing that it does not adequately specify the basis of the jury's verdict. Fourth, the Department contends that the district court relied on erroneous evidence in denying its motion for a new trial. Finally, the Department maintains that there was no basis for the damages award. We consider these claims in turn.

## II.

### A. First Amendment

The Department has argued throughout the course of this litigation that the speech for which Baron was allegedly harassed -- both the initial reporting of Curtis's infraction and the subsequent complaints of harassment -- was not protected by the First Amendment. The district court rejected this protected speech argument at summary judgment, concluding that although the report of Curtis's wrongdoing "does not seem to rise to the level of breach of a public trust," there is an inherent public concern in "the alleged supervisory tolerance of a pattern of escalating co-worker harassment launched against a corrections officer for reporting an infraction by a fellow officer in a prison setting and then complaining about the harassment." The court summarily

rejected this argument again at the close of trial in denying the Department's motion for judgment as a matter of law.[8]

The Department renews its challenge to the court's protected speech ruling on appeal.[9] Specifically, the Department asserts that there is nothing in the record to support the court's finding that Baron's speech was of inherent public interest, and thus protected speech.[10] The Department also attacks the court's First Amendment jury instructions, assigning error to the court's

---

[8]Baron asserts that the Department failed to preserve this First Amendment claim at trial. This contention rests on an error in the electronic docket, which includes two copies of the Department's motion for judgment as a matter of law based on Baron's failure to demonstrate that he was constructively discharged, identified as docket entries 98 and 99. Our review of the paper record reveals that, in fact, docket entries 98 and 99 are two distinct motions for judgment as a matter of law, one based on the First Amendment claim (number 98) and one based on the constructive discharge issue (number 99).

[9]Although the court made its protected speech determination in a summary judgment ruling, it subsequently incorporated the determination into the trial by referring to the earlier ruling in its jury instructions. In addressing the Department's protected speech argument, therefore, we are not reviewing the summary judgment determination, but rather the ruling as it was incorporated by reference into the trial by the jury instructions.

[10]The Department also argues for the first time on appeal that not only was Baron's reporting of Curtis not protected speech, but that it was not speech at all. It emphasizes that Baron merely directed his superiors' attention to a monitor on which Curtis could be seen playing cards with inmates, rather than reporting the incident himself. This claim must fail. Baron testified that he called his superiors to the monitor on which Curtis could be seen playing cards; that call, which was indisputably speech, effectively reported Curtis's infraction in violation of the code of silence.

-10-

use of the term "constructive discharge" in explaining Baron's burden of proof to establish a claim.

1. Protected speech determination

To prevail on a § 1983 claim based on a violation of his First Amendment rights, a public employee like Baron must show that "(1) his expression involved matters of public concern; (2) his interest in commenting upon those matters outweighed the [government employer's] interests in the efficient performance of its pubic services; and (3) his protected speech was a substantial or motivating factor in the . . . adverse employment actions." Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003). This appeal focuses on the first prong, the threshold question of whether Baron was speaking "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147 (1983). In answering this question of law, the Supreme Court has instructed courts to consider "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48.

Not every First Amendment inquiry requires a full Connick inquiry into form and context, however. There are some situations where public interest will be apparent from the content of speech alone:

> Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression. On the other hand, public-employee

-11-

speech on a topic which would not necessarily qualify, <u>on the basis of its content alone</u>, as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete <u>Connick</u> analysis into the form and context of the public-employee expression, "as revealed by the whole record," with a view to whether the community has in fact manifested a legitimate concern in the internal workings of the particular agency or department of government, and if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse.

<u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 913-14 (1st Cir. 1993) (internal citations omitted).

The district court determined at summary judgment that "the internal workings of the Sheriff's Department" were a matter of inherent public concern, and thus found that Baron's speech was protected without engaging in an extended analysis of its form and context.[11] The Department takes issue with this conclusion, arguing

---

[11]It is not entirely clear from the summary judgment decision whether the district court's ruling on protected speech applied to both Baron's reporting of Curtis and his subsequent complaints of harassment, or only to the latter. The Department contends that the summary judgment order treated only the latter speech as protected and that the court committed an additional error when it referred to both the reporting and the complaints as protected speech in the jury instructions. We disagree.

Although the district court did raise doubts at summary judgment as to whether the report was protected speech, it did not conclusively make such a ruling. An instruction treating the initial report as protected speech is consistent with the court's summary judgment statement that "[i]t is essential that corrections officers be able to speak freely about misconduct." While playing cards with inmates may be viewed as a relatively minor infraction, a casual attitude toward reporting "minor" infractions may lead to more serious infractions going unreported as well. The court's jury instruction that it had found both Baron's initial reporting of Curtis and his subsequent complaints of harassment protected was therefore not plainly erroneous.

that the content of Baron's expression was not a matter of inherent public concern because it dealt exclusively with internal working conditions at the House of Correction. We disagree.

It is true that some speech about internal working conditions would not be of inherent public interest. For example, in Connick, the Court considered whether a questionnaire circulated by an Assistant District Attorney to her colleagues was protected speech under the First Amendment. Most of the questionnaire dealt with office transfer policy, employee morale, and the performance of certain supervisors. The Court concluded that questions related to discipline and morale were not protected speech:

> [W]e do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. . . . Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo.

461 U.S. at 148. Based on that holding, we noted in O'Connor that speech about internal working conditions may not qualify as a matter of inherent public concern "on the basis of its content alone," and instead "may require a more complete Connick analysis." 994 F.2d at 914.

As the district court recognized, however, Connick does not entirely foreclose the possibility that under some circumstances, speech regarding internal working conditions may be of inherent public interest. Indeed, the Supreme Court identified one item on the Connick questionnaire as falling into this

-13-

category: a question asking whether Assistant District Attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates." 461 U.S. at 149. Noting that "there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service," the Court found that the political pressure question involved "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." Id.

The district court concluded that this line of reasoning applied equally to Baron's repeated reports of harassment in retaliation for violating the code of silence:

> It is apparent that the issue of whether a corrections officer is willing to "walk the blue line" to report wrongdoing within the prison walls is a matter of great interest to the community, and the courts. This problem is analogous to the situation in which a public employee feels pressured to work in a political campaign, which the Supreme Court discussed in Connick. It is essential that corrections officers be able to speak out freely about misconduct without the pressure of a "code of silence" and fear of extreme retaliatory harassment sufficient to force resignation.

The court also emphasized that "[t]he community has in fact manifested a legitimate concern in the internal workings of the Sheriff's Department." As evidence of that concern, the court cited a series of 2001 Boston Globe newspaper articles chronicling abuse and mismanagement at the House of Correction, and the Stern Report, commissioned by Governor Jane Swift in 2001 in response to mounting allegations of mismanagement of the Suffolk County

-14-

Sheriff's Department, which recommended a number of sweeping changes to the Department, including an aggressive attack on the code of silence.[12]

The Department now argues that the district court should not have considered these sources because they reflect public interest several years after the speech at issue here. While it is true that this specific evidence of public interest post-dates Baron's speech, there is nothing to suggest that the public would not have been similarly interested in internal Department conditions in 1997 and 1998 when Baron repeatedly complained about retaliatory harassment without a meaningful response from his superiors. Given that the court's protected speech determination rested on a finding of <u>inherent</u> public interest, the small time discrepancy that the Department points to is unimportant. If there was an inherent public interest in internal Department conditions in 2001, there is no reason to doubt that the same interest was present in 1997.

Retaliation against officers who breach a code of silence among their colleagues at a county House of Correction implicates the public interest in a way that morale among Assistant District Attorneys does not. Unlike the speaker in <u>Connick</u>, Baron was

---

[12]The Stern Report was not offered into evidence at trial and the district court emphasized that it did not consider the report in evaluating the Department's post-verdict sufficiency of the evidence claim. It is, however, part of the record on appeal because of the court's reliance on it at the summary judgment stage.

reporting actual wrongdoing on the part of public employees. Cf. 461 U.S. at 148 (employee did not "seek to bring to light actual or potential wrongdoing"). The wrongdoing Baron complained of, including officers' violations of prison policy, retaliation for breaching the code of silence, and prison officials' failure to investigate or put a stop to that retaliation, affected not only Baron and his co-workers, but also the prison inmates who were under the Department's control. Accordingly, Baron's speech involved a "legitimate matter of inherent concern to the electorate," O'Connor, 994 F.2d at 913-14, and the district court properly "eschew[ed] further inquiry into the employee's motives." Id. The Department's additional arguments regarding the form and context of Baron's speech are thus inapposite.

### 2. Constructive discharge jury instruction

The Department also contends that it is entitled to a new trial based on the district court's instructions to the jury on the elements of Baron's First Amendment claim. As the Department concedes, it forfeited this claim by failing to timely object to the instructions as required by Fed. R. Civ. P. 51(c). The district court cited this failure as the basis for refusing to consider the Department's challenge when it was raised for the first time in a post-trial motion. The Department now renews its claim before us.

A petitioner's "failure to object when the court issued the [jury] instruction constitute[s] a forfeiture of her right to

-16-

object on appeal." Flynn v. AK Peters, Ltd., 377 F.3d 13, 25 (1st Cir. 2004). Under Fed. R. Civ. P. 51(c)(2)(A), a timely objection to jury instructions must be raised before the instructions are delivered. "Our interpretation of Rule 51 is quite strict." Connelly v. Hyundai Motor Co., 351 F.3d 535, 544 (1st Cir. 2003). "There is a good reason for this strictness. We enforce our object-or-forfeit rule 'to compel litigants to afford the trial court an opportunity to cure [a] defective instruction and to prevent the litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error.'" Flynn, 377 F.3d at 25 (quoting Cross v. Cleaver, 142 F.3d 1059, 1068) (8th Cir. 1998)) (alteration in original). Accordingly, we review the Department's forfeited claim only for plain error. See Fed. R. Civ. P. 51(d)(2); Babcock v. Gen. Motors Corp., 299 F.3d 60, 63-64 (1st Cir. 2002).

The Department assigns error to the district court's references to Baron's "constructive discharge" in explaining the necessary elements of his First Amendment claim. It contends that these references gave jurors the mistaken impression that the court had already determined that Baron was constructively discharged, when in fact it remained part of Baron's burden of proof to make that showing. A review of the full jury instructions, however, clearly belies this claim. The court explained that:

> The second element of plaintiff's claim is that he was constructively discharged . . . and that this constructive discharge deprived him of his constitutional

-17-

right of free speech under the First Amendment and his right of due process under the Fourteenth Amendment.
. . . .
In order to find that the plaintiff has been constructively discharged, he must prove by a preponderance of the evidence that his working conditions were so difficult and so unpleasant that a reasonable person in his shoes would have felt compelled to resign. In order to prevail, Mr. Baron must prove that based on an objective assessment of the conditions under which he was expected to work, it was so difficult as to be intolerable.

The court then went on to explain the remaining elements of Baron's First Amendment claim:

In order to prove his First Amendment claim against the Department, Mr. Baron must establish two elements of his claim: First, that his acts or speech were protected by the free speech clause of the First Amendment; and second, that those acts of speech were a substantial or motivating factor in his constructive discharge.

Coming on the heels of the instruction regarding the requisite findings for a constructive discharge, the use of the term "constructive discharge" in this and the ensuing instructions in no way suggests that the court had already concluded that Baron had been constructively discharged. The instruction was not plainly erroneous.

**B. Municipal Liability**

It is well-settled that municipalities may not be held liable for the constitutional violations of their employees in a § 1983 suit based on a respondeat superior theory of liability. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official

-18-

policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). But "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." Britton v. Maloney, 901 F. Supp. 444, 450 (D. Mass. 1995), aff'd in part and rev'd in part on other grounds, 196 F.3d 24 (1st Cir. 1999). In a § 1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Id.; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988) (plurality opinion). If a custom is attributable to the municipality, we must also inquire whether it was "the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro, 871 F.2d at 1156.

The Department contends that the verdict against it cannot stand because Baron did not demonstrate the prerequisites for municipal liability set forth in Monell and Bordanaro. Specifically, it insists that Baron presented insufficient evidence

to establish that the ongoing harassment he suffered was the result of a custom or policy of which a policymaker had actual or constructive knowledge. We disagree.

### 1. Evidence of custom

We review de novo the district court's denial of a motion for judgment as a matter of law. Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004). "In undertaking this review, we look to all evidence in the record, drawing all reasonable inferences therefrom in the nonmovant['s] favor, and resist the temptation to weigh the evidence or make our own credibility determinations." Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004). We will affirm the denial unless no reasonable person, viewing the evidence in this light, could have reached a verdict for the nonmoving party. Id. A challenge to the denial of a motion for a new trial faces a similar uphill battle; we review the denial only for an abuse of discretion. Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 13 (1st Cir. 2004).

The Department moved for judgment as a matter of law during the trial, and for judgment as a matter of law or a new trial after the verdict, asserting that Baron had not shown a custom within the Department of retaliating against corrections officers for breaches of a code of silence. The district court summarily rejected the trial motions and disposed of the post-trial motion in a written order that thoroughly explained its reasoning.

The Department disputes the district court's post-trial explanation that there was sufficient evidence to establish a custom of "condoning the use of harassment to enforce the code of silence against 'rats.'" It points out that Baron testified only to his own experience. Unlike other cases involving similar claims, there was no evidence here that other House of Correction officers had suffered such retaliation or that other complaints had not been adequately investigated. Cf., Jeffes v. Barnes, 208 F.3d 49, 53 (2d Cir. 2000). Absent such evidence, the Department contends, a jury could not reasonably have concluded that Baron's harassment was attributable to a municipal custom.

As Baron points out, however, the Department's position unduly minimizes Feeney's testimony. Feeney was the deputy superintendent, fourth-in-command in the Department, in January 1997 when the harassment of Baron began. He was promoted to superintendent, third-in-command and in charge of day-to-day operations at the House of Correction, in October 1997 while the harassment was ongoing. Feeney testified at trial that "there are some officers that are reluctant to report things, and when they do, they're evasive and vague in their reports." Baron's attorney then asked Feeney to read from his earlier deposition, in which the following exchange took place:

Q: Are you aware of any code of silence between fellow officers reporting violations on each other?
A: Yes.

Q: What is it, the code of silence?

A: Lack of reporting to protect each other.

Q: When Officer Baron reported Sergeant Curtis, did he violate that?

A: Yes.

Feeney was then asked if there would be consequences if an officer were to report another officer. He answered, "There could be." Cf. Sharp v. Houston, 164 F.3d 923, 935 (5th Cir. 1999) (recognizing that a code of silence "can be perpetuated only if there is retaliation for violations of it"). Feeney also testified that Baron had complained to him about the harassment.

That other Department employees denied at trial the existence of a code of silence would not preclude a reasonable trier of fact from crediting Feeney's statements as evidence of a custom. The jury could have found that Feeney's statements, together with Baron's testimony that the harassment began almost immediately after he reported Curtis, demonstrated a custom of retaliation to enforce a code of silence.[13] See Blair v. City of

---

[13]As we explain below, a jury could have found not only that this custom of retaliatory harassment existed, but also that it was attributable to the Department. The evidence supporting such a finding forecloses the Department's argument that Baron failed to establish that a Department custom caused officers to harass him. Baron's testimony also supported a finding that the harassment led to his constructive discharge, given the heavy physical and emotional toll that it inflicted on his personal and family life. See infra Section E. Baron therefore established the requisite "affirmative link" between a municipal custom and the constitutional deprivation. See Bordanaro, 871 F.2d at 1157 (citing Okla. City v. Tuttle, 471 U.S. 808, 823 (1985)); see also Tuttle, 471 U.S. at 824-25 & n.8.

Pomona, 223 F.3d 1074, 1079-80 (1st Cir. 2000) (former police officer's charges that he suffered ongoing harassment after reporting corruption on special police task force, if believed by jury, were sufficient to establish "custom of chastising whistleblowers"). Indeed, as the district court recognized, "the jury could reasonably have inferred from the failure of numerous defense witnesses (like corrections officers) to corroborate Baron's testimony that such a custom would make it extremely difficult to substantiate any allegations against it." As an example, the court cited testimony by corrections officer Hubert Holtzclaw, regarding the cafeteria confrontation between Hickey and Baron, that "Hickey didn't slam cheese on the table in front of Baron, but instead placed a handful of napkins on the table as a gesture of good will." The court noted that "[t]he jury could reasonably have inferred that this testimony was incredible (even Hickey conceded that he bore no good will toward Baron), and was prompted by a desire not to testify against a fellow officer." In light of such difficulties in corroborating a code of silence, Baron's testimony takes on additional weight and Feeney's admission regarding his knowledge of the code is all the more significant.

The Department also challenges Baron's claim of a custom by invoking the rule that a single unconstitutional incident is insufficient to impose municipal liability under § 1983; instead, a plaintiff has to offer "considerably more proof than a single

-23-

incident . . . to establish . . . the requisite fault on the part of the municipality." <u>Tuttle</u>, 471 U.S. at 824. In considering this issue, the district court stressed that the "single incident" rule "is not immutable." It pointed to decisions recognizing that "serial misconduct" directed at a single victim may be sufficient to establish municipal liability, and concluded that this was such a case. The Department asserts that these serial misconduct cases are inapposite because this case involved only "one current employee complaining to one investigator about his work conditions."

This description of the case is not consistent with the record. As the district court explained, the evidence makes this case more akin to the serial misconduct cases than to cases implicating the single incident rule:

> Plaintiff presented evidence of a head-in-the-sand attitude by the SID. . . . [T]he jury could reasonably have found that SID made only a perfunctory inquiry, failed to write a report or even keep a file, and declined to impose any sanctions or take any proactive steps to stop the harassment. The jury could find that Baron made dozens or even scores of complaints . . . most of which was [sic] in essence ignored or lost by supervising officers in SID. Further, Neville Arthur, the SID officer with whom Baron filed most of his complaints, testified that he had no knowledge of derogatory "posters" ever being hung around the Department. This testimony, in light of the three such posters [targeting Baron] admitted into evidence and other supervisors' unabashed acknowledgment that such posters were a regular feature of the workplace within the Department, may reasonably have lent support to the finding that there was an unofficial custom at the Department of turning a blind eye to workplace harassment . . . .
> . . .

-24-

. . . The harshness of the defendant's sanctions against Baron for minor policy infractions was also evidence of the Department's turning a cold shoulder to his plight and affirmatively joining in the peer pressure to force him out.  Most significantly, the defendant threatened termination when Baron reported an assault on an inmate's girlfriend directly to the police rather than immediately to supervisors whom he later informed.  Even though Baron was on probationary status, the jury could have found that the threatened sanction was draconian, under the circumstances, and forced him out.[14]

Baron reported multiple incidents of harassment, including physical threats and property destruction, to his superior officer, to SID investigator Arthur, and to Feeney.  Baron also met with union president Michael Powers and Deputy Superintendent Marie Lockhart in January 1998 to report the ongoing harassment.  This is not a case, then, of attributing liability to the municipality based on a single incident of isolated employee conduct.  Rather, the record demonstrates a pattern of ongoing harassment that the jury could have found high-ranking Department officials were aware of and did not stop.  Compare Kibbe v. City of Springfield, 777 F.2d 801, 805-06 (1st Cir. 1985) (actions of multiple police officers in connection with the pursuit and arrest of a single suspect were adequate basis for municipal liability because "the widespread activity here is more likely to reflect the operating procedures of the police department than would a single

---

[14]This passage is also the basis of another challenge by the Department, namely that the court erred in citing this point regarding sanctions in denying the motion for a new trial. See infra Section D.

incidence such as occurred in <u>Tuttle</u>") <u>with</u> <u>Tuttle</u>, 471 U.S. at 811, 823-24 (one shooting by a single police officer was insufficient to establish municipal liability for inadequate officer training). The Department was therefore not entitled to judgment as a matter of law or a new trial on the basis of insufficient evidence of the code of silence.

### 2. Policymaker determination

To establish municipal liability, a plaintiff must demonstrate not only that a custom caused a deprivation of his rights, but also that the challenged practices were "so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them." <u>Bordanaro</u>, 871 F.2d at 1157. The Department now argues that the jury verdict cannot stand because Baron and the court failed to identify a specific Department policymaker who knew of the custom of a code of silence enforced by retaliatory harassment and who condoned it or acquiesced in it.

The Department sought judgment as a matter of law at multiple points during the trial. It did not, however, specifically assert the claim now before us, as is indicated by the court's response when the Department finally did raise the issue in a post-trial motion: "The defendant argues that there was no evidence with regard to who is a policymaker of the Sheriff's Department. . . . This was not an issue pressed at trial." Baron

-26-

had presented evidence that Feeney, the Department deputy superintendent and superintendent during the relevant period, was aware of the code of silence and consequences for violating it, and was also aware of Baron's harassment complaints. Feeney testified that he was third-in-command in the Department and was responsible for overseeing the day-to-day operations of the House of Correction. This testimony suggested that Baron believed Feeney to be the relevant policymaker for purposes of this litigation. The Department gave no indication at trial that it disagreed with that assessment.

The Department's proposed jury instructions were similarly mute as to who it believed was the final policymaker for purposes of establishing municipal liability. It failed to object in the pre-charge conference or in open court to the court's instruction to the jury that "for purposes of determining the liability of the Sheriff's Department, the Department was the official entity responsible for establishing final policy with respect to investigating complaints of employee misconduct and imposing appropriate discipline." It was not until after the jury returned its verdict that the Department pressed the policymaker issue for the first time, arguing that it was entitled to a new trial on the basis of this jury instruction. Because the Department forfeited its objection on this point by failing to raise it in a timely manner, our review is only for plain error.

See Fed. R. Civ. P. 51(d)(2). Under this standard, we will notice an error only if it is clear and prejudicial, and if "a miscarriage of justice would otherwise result." Olano, 507 U.S. at 735-36 (internal quotation marks deleted).

The Department assigns error to the district court's identification of "the Department" as the relevant policymaker, arguing that the failure to identify a specific final policymaker within the Department was erroneous because it allowed the jury to find municipal liability if any Department employee knew of Baron's harassment claims. This overstates the point. Although the district court's instruction would be error if understood this way, see Monell, 436 U.S. at 694 (concluding that "a municipality cannot be held liable under § 1983 on a respondeat superior theory), it must be read as qualified by the court's later statement that liability could be imposed only if "Department policymakers" were aware of the custom of retaliation and Baron's situation. It is highly unlikely that the jury interpreted the phrase "Department policymakers" to mean "any Department employee," particularly in light of evidence that the Department superintendent, not just "any" employee, was aware of Baron's complaints.

Yet, even this qualified version of the court's statement might be too broad under the case law because it is only a policy made by the final policymaker that exposes a municipality to liability, see, e.g., Silva v. Worden, 130 F.3d 26, 31 (1st Cir.

-28-

1997) (explaining that municipal liability for acts taken pursuant to a policy "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered") (internal quotation marks and emphasis omitted). Therefore, in a case alleging an affirmative wrongful policy (as opposed to a custom acquiesced in), the court would have to identify an individual or body as the final policymaker, and the jury would have to determine whether the policy at issue could be attributed to that policymaker. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).

However, Baron claims not that an individual or body adopted an unconstitutional policy but that the Department had a custom tolerated by policymakers who should have intervened to correct it. In this custom context, our past language has sometimes referred to policymakers in the plural, rather than to a final policymaker. See, e.g., Silva, 130 F.3d at 32 (rejecting a § 1983 claim based on custom because there was not "sufficient evidence that the City's policymaking officials could be said to have had actual or constructive knowledge of the practice"). The requirement in the affirmative policy cases that the district court identify a final policymaker may therefore not apply in those cases based on custom. See Webb v. Sloan, 330 F.3d 1158, 1164 (9th Cir. 2003) (explaining that in a § 1983 suit based on custom, the plaintiff "must prove the existence of a longstanding practice or

policy to the satisfaction of the factfinder" but that in a suit premised on an act by a person with final policymaking authority, "the court must decide, as a matter of state law and before the case may be submitted to the jury, whether the person who committed the violation had final policymaking authority"); but see Jett, 491 U.S. at 737 (noting the requirement that the court identify a final policymaker without distinguishing between § 1983 suits based on custom and those based on policy).  We need not resolve this question here; under the plain error standard, it is enough that any error in the district court's reference to "Department policymakers" without identification of a specific final policymaker is not clear.

Moreover, even if the district court should have identified a final policymaker in this custom case, the Department is not entitled to a new trial because it cannot show prejudice resulting from the error.  In a post-trial ruling, the district court concluded without explanation that the superintendent and deputy superintendent set policy for the jail in the relevant areas, implying that it believed Feeney was the relevant policymaker.  See Praprotnik, 485 U.S. at 123 (policymaker is official responsible for making policy "in that area of the [municipal entity's] business").  If Feeney did set final policy for the House of Correction, the Department was not prejudiced by the verdict because he admitted that he knew that the code of

silence existed, that there could be consequences for violating it, and that Baron had complained of harassment.  In other words, the jury could have found that Feeney had knowledge of the custom that resulted in a deprivation of Baron's constitutional rights and that he acquiesced in the custom by failing to take actions to stop it.

The Department asserts, however, that Sheriff Rouse, not Feeney, was the final policymaker under state law.  Although there is no evidence on this issue in the record, it seems self-evident that the sheriff is the final policymaker within the Department as a matter of law.  See Mass. Gen. Laws ch. 126, § 16;[15] cf. Jeffes,

---

[15]Under Massachusetts law,

> The sheriff shall have custody and control of the jails in his county, and, except in Suffolk county, of the houses of correction therein, and of all prisoners committed thereto, and shall keep the same himself or by his deputy as jailer, superintendent or keeper, and shall be responsible for them.

Mass. Gen. Laws ch. 126, § 16.  The state legislature amended the exception for the Suffolk County House of Correction in 1991, conditioning a 1992 appropriation for county corrections on the following basis:

> [N]otwithstanding [Mass. Gen. Laws ch. 126] . . . the current Suffolk County House of Correction and the new Suffolk County House of Correction shall be under the sole and exclusive control of the sheriff of Suffolk County who shall administer the same in the same manner and with the same authority as found in the statutes which govern the administration of the Suffolk County Jail.

1991 Mass. Acts ch. 138, § 362 (line item 8910-0030); see also Suffolk County Sheriff's Department, Sheriff Andrea J. Cabral, at http://www.scsdma.org/sheriffOffice/sheriffBio.html (sheriff is "responsible for the operation of the House of Correction") (last

-31-

208 F.3d at 58 (under New York law, the county sheriff is final policymaker with respect to conduct of staff members toward fellow officers). Emphasizing that Baron did not present any evidence regarding the Sheriff's actual knowledge of the code of silence and retaliatory harassment, the Department contends that a legal determination that the Sheriff was the final policymaker conclusively establishes prejudice. On this point, the Department is wrong.

It is true that Baron did not demonstrate that the Sheriff actually knew of the custom that led to his constructive discharge. Although Rouse may not have had actual knowledge of the custom, however, municipal liability can also be based on a policymaker's constructive knowledge -- that is, if the custom is so widespread that municipal policymakers should have known of it. Bordanaro, 871 F.2d at 1157. If the jury had been instructed that Rouse was the policymaker, it might have agreed that there was insufficient evidence to establish that he acquiesced in or condoned enforcement of the code of silence. On the other hand, the jury might also have concluded that if Superintendent Feeney was aware of the code of silence as third-in-command in the Department, constructive knowledge was also attributable to Rouse.[16]

visited Mar. 3, 2005).

[16]We do not view this conclusion as precluded by the district court's award of qualified immunity to the Sheriff at the summary judgment stage, nor does it appear that the Department has advanced that argument. The court premised its qualified immunity ruling on

Prejudice in this case is far from clear.  Pursuant to the plain error standard, the Department has the burden of establishing prejudice.  The uncertainty of the prejudice is also fatal to its claim.  See Acevedo-Garcia v. Monroig, 351 F.3d 547, 571 (1st Cir. 2003) (declining to award a new trial where "prejudice to the aggrieved party is not manifest on the face of the record").

Nor has the Department established that it would be a miscarriage of justice to allow the verdict to stand.  The Stern Report urged an "aggressive attack on the code of silence," explaining that "[s]taff [in the Department] consistently expressed concern that if they reported misconduct of fellow staff, they could expect retaliation from their peers."  The fact that this was a consistent concern among Department employees demonstrates that the existence of the code of silence and the possibility of retaliatory harassment were well-known throughout the Department during Rouse's tenure.  In short, the code of silence charged by Baron was real and pervasive.  Viewing the verdict against this background, we conclude that the jury instruction's failure to identify a policymaker was not an error (if an error at all) that

the fact that Baron had not "shown any incident, report, complaint, or testimony that demonstrates that the Sheriff was on notice of the code of silence and the need to address it in 1997 and 1998." Significantly, the court also acknowledged "evidence that the Suffolk County House of Correction had a widespread custom and practice of tolerating a code of silence."  A jury could have attributed constructive knowledge of this "widespread custom" to the Sheriff despite the court's finding that he did not have sufficient knowledge of it to incur personal liability.

"seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Olano, 507 U.S. at 736 (quotation marks omitted).

## C. Special verdict form

Question Five on the special verdict form asked the jury whether Baron "prove[d] that the Suffolk County Sheriff's Department had a custom, policy, or practice that caused a violation of his civil rights," to which the jury answered "Yes." The Department took issue with this question for the first time in a post-trial motion, arguing that it was faulty because it did not inquire whether the verdict rested on a violation of Baron's First Amendment rights or his due process rights. Maintaining that there was insufficient evidence to support a finding based on Baron's due process theory, the Department emphasizes the rule that "[a] new trial ordinarily is required when a special verdict finding encompasses multiple facts and claims some of which should not have been submitted to the jury . . . [because] it is impossible to tell whether consideration of the improperly submitted claims may have affected the verdict." Lattimore v. Polaroid Corp. 99 F.3d 456, 468 (1st Cir. 1996).

Although we have previously considered the possibility that a party forfeited a claim based on this rule by failing to request a special verdict, see Davis v. Rennie, 264 F.3d 86, 106-07 (1st Cir. 2001), we recently rejected the application of plain

-34-

error review in this context.  See  Gillespie v. Sears, Roebuck & Co. 386 F.3d 21, 31 (1st Cir. 2004).  Instead, we concluded that "a uniform obligation to ask for a special verdict, or have relevant claims of error forfeit by appellant, is not warranted."  Id.

Seizing upon this new trial prospect, the Department argues that Baron's due process claim should not have been submitted to the jury because Baron did not have a property interest in his position when he was constructively discharged. See Galloza v. Foy, 389 F.3d 26, 33 (1st Cir. 2004) (due process rights extend only to public employees who have a property interest in continued employment as determined by local law and terms of employment).  Specifically, the Department asserts that Baron lost his property interest in his position when he was placed on probation in December 1997 because one term of his probation was that "any violation of Department policy . . . shall constitute just cause for his immediate termination."  The Department reasons that Baron then violated Department policy during the probationary period (resulting in the twenty-day suspension that was pending when Baron resigned), and therefore was subject to immediate termination at the time of his resignation.  As such, the Department contends, there was no process due and the jury should not have been allowed to consider this as a basis for municipal liability.

We need not determine whether the due process claim should have been put before the jury, however, because we are reasonably sure that the verdict rested on the adequately supported First Amendment theory rather than on the due process theory. See Gillespie, 386 F.3d at 30 ("Recognizing that a jury is likely to prefer a better supported theory to one less supported, we have generously applied the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support."). This conclusion is based on a review of the jury instructions and the special verdict form as a whole. In explaining Question 5, the court offered the following summary:

> In order to prevail against the [Department] here, Mr. Baron must prove that he was harassed during the course of his employment by coworkers; two, that one substantial reason for the harassment was because he reported another officer's conduct . . . or because he reported coworker harassment; three, that a practice of retaliating against officers who breached a code of silence existed at the House of Correction; four, that a practice of retaliation against officers for breaching the code was so well established and widespread that Department policymakers must have known about it; five, that the Department policymakers were aware of a widespread practice of officer retaliation based on violation of a code of silence and took no steps to end or discourage the practice; six, that the failure of the Department policymakers to eliminate employee retaliation caused the harm suffered by Mr. Baron; seven, that the Department policymakers were aware of the type and extent of the harassment suffered by Mr. Baron and did nothing to end it; eight, that the conditions were so intolerable that they forced Baron to resign; and finally, that the constructive termination caused him damages.

This instruction, which specifies that the harassment must have resulted from Baron's protected speech, set forth the elements of a claim based on the First Amendment; it did not suggest that the jury could return a verdict for Baron based solely on a finding that his due process rights had been violated. There is thus little danger that the jury's answer to Question 5 rested on the latter theory, and there is no need for a new trial on that basis.

**D. Other trial issues**

The Department also assails the district court's denial of its motion for a new trial on the grounds that the ruling relied on erroneous facts. Again, we review the court's denial of a motion for a new trial for abuse of discretion. Rivera Castillo, 379 F.3d at 13.

The Department first challenges the district court's statement that, "[T]he only time SID investigated [Baron's complaints] was when [Lieutenant Robert] Pizzi, an officer, filed a written report." It claims that, in fact, the SID had already begun investigating in response to Baron's written complaint, and it interviewed Pizzi in connection with that investigation. While the court may have misstated this fact, that misstatement does not remotely require a new trial because there was ample other evidence to support the verdict that a custom of condoning retaliatory harassment caused Baron's constructive discharge. See Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 375 (1st Cir. 2004)

(noting that a court should grant a new trial only if the verdict is "against the clear weight of the evidence") (internal quotation marks omitted).

Next, the Department takes aim at the district court's statement that "[t]he harshness of the defendant's sanctions against Baron for minor policy infractions was also evidence of the Department's turning a cold shoulder to his plight and affirmatively joining in the peer pressure to force him out." The Department argues that Baron's policy infractions were not "minor" and asserts that the district court prevented it from exploring the severity of Baron's misconduct at trial. Specifically, the Department emphasizes that the court cut off questioning of Captain John Scaduto regarding the severity of Baron's infraction of giving food to an inmate. The Department also attacks the court's statement that "the defendant threatened termination when Baron reported an assault on an inmate's girlfriend." It contends that the court erred in attributing the threat of termination to the Department, when in fact it came from the union representative negotiating Baron's discipline settlement rather than from the Department itself. The Department asserts that together, these errors indicate that the district court abused its discretion in denying the motion for a new trial.

In a post-verdict motion for a new trial, the evidence is viewed in the light most favorable to the verdict. Stuart v.

-38-

United States, 337 F.3d 31, 37 (1st Cir. 2003). Regardless of who threatened Baron with termination, Baron was given a ten-day suspension for a policy infraction, and that suspension was increased to twenty days when Baron refused to sign the ten-day agreement because it contained inaccuracies. The policy infraction leading to this suspension was Baron's decision to inform the Boston Police Department of a reported sexual assault without first telling his superiors. As the court recognized, the jury may have viewed the Department's response to this infraction as draconian. The denial of a new trial on this basis was not an abuse of discretion.

**E. Damages**

In a post-trial motion, the Department asserted that it was entitled to a new trial or remittitur because the $500,000 damages award was unsupported by the evidence. The court rejected this motion, concluding that, "While Baron hardly put in any evidence of economic damages at all, there was considerable testimony from him concerning the stress and anguish induced by the harassment. . . . In light of the length, extent, and viciousness of the harassment Baron suffered, the jury award was not unreasonable." The Department renews its claim before us. Emphasizing that Baron presented little evidence of economic damages and no evidence of medical consequences of the harassment,

the Department contends that allowing the $500,000 award to stand would be a miscarriage of justice.

"Where defendants properly preserve a challenge to the amount of compensatory damages awarded by the jury, our inquiry is limited to determining whether the trial court abused its discretion in refusing to set aside the verdict as excessive." Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 102 (1st Cir. 2003) (quotation marks omitted), cert. denied, 124 S. Ct. 1875 (2004). "In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party and to grant remittitur or a new trial on damages only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 502 (1st Cir. 1994) (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 872 (1st Cir. 1982)); see also Consolo v. George, 58 F.3d 791, 795 (1st Cir. 1995) (noting that damages award "cannot be disturbed unless the award exceeded any rational appraisal or estimate of the damages . . . or was grossly excessive, inordinate, shocking to the conscious of the court, or so high it would be a denial of justice to permit it to stand") (quotation marks omitted).

The district court instructed the jury that, "You can award damages [against the Department] for pain and emotional suffering, emotional distress, as well as economic damages."

Although Baron presented little evidence of economic damages, his testimony demonstrated that the harassment had taken a heavy emotional toll on him. Over the course of many months, Baron was subjected to vicious threats and physical intimidation. He received harassing phone calls that included taunts about his wife, who suffered from multiple sclerosis and was confined to a wheelchair. Posters displayed throughout the House of Correction labeled him a rat and suggested that he was a child molester. His car was smeared with feces and his tires were slashed. Other officers refused to cover his post for restroom breaks, forcing himself to relieve himself in a cup. This harassment affected his health, requiring him to be taken to the hospital after collapsing from stress. Baron testified that by the summer of 1998, he "was doing terrible," suffering from headaches, and could not sleep. He also testified that the harassment affected his family life, causing him to be short-tempered with his children and with his ailing wife. Ultimately, the harassment took such a serious toll that he was forced to quit his job. In light of these facts, an award of $500,000 does not "exceed[] any rational appraisal or estimate of the damages" in this case, Sherwin Williams, 40 F.3d at 502 (quotation marks omitted), and we will not disturb it.

**Affirmed**.